DAVIS, Circuit Judge.
 

 American Employers Insurance Company (American Employers) appeals from a decision of the Claims Court (Mayer, J.) holding that the United States was not liable, after a final settlement in 1950, for additional premium payments on an insurance contract issued during World War II. We agree with the Claims Court.
 

 BACKGROUND
 
 [1]
 

 During World War II, Bethlehem-Alameda Shipyard, Inc. (Bethlehem-Alameda) entered into cost-plus shipbuilding contracts with the United States Maritime Commission and built 10 vessels used during the war-time effort. Under the provisions of these contracts, Bethlehem-Alameda was required to provide workers’ compensation insurance for its employees. Any premiums paid by Bethlehem-Alameda were then
 
 *702
 
 passed on to the Maritime Commission for reimbursement. Appellant was underwriter of the workers’ compensation policy covering Bethlehem-Alameda employees for the period October 19, 1942 through June 19, 1948.
 

 The insurance policy was written under the provisions of the California Defense Rating Plan (Rating Plan). The Rating Plan reflects a cost-plus basis under which periodic premium payments are adjusted retroactively to reflect actual loss experience. According to the provisions of the Rating Plan, the insured gave appellant an advance deposit of a premium, and at the end of a specified period, a final premium was determined based on actual loss experience. The payments consisted of a deposit premium of not less than 15% of the estimated annual premium and monthly payments of not less than 50% of the standard monthly premium. The goal was a premium payment comprised of “a fixed charge plus modified losses plus all actual allocated claim expenses, all multiplied by the tax multiplier, subject to a maximum premium equal to 90% of the standard premium times the tax multiplier.” The standard premium was the workers’ compensation premium, without discounts, prescribed by the State of California. Excluding the tax multiplier, the premium cost under the war contract would not exceed 90% of the allowable workers’ compensation rate charged during peace-time economy. The premium could be significantly less than the 90% “cap,” however, because it was tied to actual loss experience. In determining the final premium, the insured contractor either made an additional payment in excess of the progress payments or received a refund depending on the level of filed and pending claims.
 

 With the close of World War II, the United States proceeded to terminate, assign, and settle contracts and subcontracts entered into for the war effort, pursuant to the Contract Settlement Act of 1944 (Act), 41 U.S.C. § 101
 
 et seq.
 
 Accordingly, the Bethlehem-Alameda shipbuilding contract was closed out in 1948. Bethlehem-Alameda assigned all rights and obligations under the workers’ compensation insurance policy underwritten by appellant to the Maritime Commission, effective June 19, 1948.
 

 As established by the provisions of the Rating Plan, a final settlement of premiums was to occur within 8 months of the expiration of the policy. Appellant and the Maritime Commission negotiated to extend the time for final settlement up to 245 weeks from the expiration date of the policy. The parties conducted final settlement negotiations some time during 1949-1950 and a final settlement was reached in June 1950.
 
 [2]
 
 During settlement negotiations, American Employers did not seek to set aside any reserves for occupational injuries and diseases that might go undetected for many years. Since 1977, more than 30 claims have been received from former Bethlehem-Alameda employees for injuries said to arise from asbestos exposure in the shipyard during the war-time effort.
 

 In July 1982 American Employers brought suit in the Claims Court, seeking additional premium payments from the Government to cover former workers who had filed claims for and incurred asbestos-related illnesses. It argued that the final settlement it had negotiated with the Maritime Commission did not apply to occupational-related injuries or diseases incurred but not reported at the time of settlement. The final settlement was said to apply only to claims actually pending or filed at the time of the 1950 settlement. On that view, American Employers asked the court for additional premium payments to cover former workers who had incurred asbestos-related illnesses and filed claims well after World War II.
 

 The Claims Court held that the Contract Settlement Act of 1944 applied and that the final settlement carried with it final disposition and release of all further claims. The court also found no support for appellant’s' assertion that there was a mutual mistake
 
 *703
 
 that would justify reformation of the final settlement or of the release of its claims. Summary judgment was granted for the Government
 
 [3]
 

 DISCUSSION
 

 A.
 
 The 1950 Settlement.
 
 The major issue is whether the Maritime Commission and American Employers reached a “full and final settlement” within the meaning of the Contract Settlement Act of 1944. Section 103(m) of the Act provides that “[t]he term ‘final and conclusive/ as applied to any settlement, finding, or decision means that such settlement, finding or decision shall not be reopened, annulled, modified, set aside, or disregarded ... in any suit, action, or proceeding except as provided by this chapter.” Section 106(c) deals with conclusiveness of settlements and provides for certain exceptions:
 

 where any such settlement is made by agreement, the settlement shall be final and conclusive, except (1) to the extent otherwise agreed in the settlement; (2) for fraud; (3) upon renegotiation to eliminate excessive profit under section 1191 of Appendix to Title 50, unless exempt or exempted under such section; or (4) by mutual agreement before or after payment____
 

 The Claims Court held that the 1950 settlement was a final settlement under the Act. In reaching that conclusion, the court concluded that exception (1) of § 106(c) did not apply because American Employers had failed to show that the parties had agreed to exempt those employees who had incurred injuries but had not reported them prior to final settlement. The judge also concluded that exceptions (2), (3), and (4) are not relevant on the facts of this case.
 

 American Employers argues to us that there was no “full and final settlement” because either exclusion (1), or, alternatively, exclusion (4) applies in the present circumstances. The essence of the contention is that the Rating Plan, which provided for a cost-plus-a-fixed fee reimbursement for all claims, was effectively incorporated into the final settlement agreement, thus putting the final settlement within the protective ambit of exception (1). Appellant then argues that exception (4) also applies because of the assignment agreement (in 1948) under which the Maritime Commission became responsible for all present and future obligations of the shipyard with respect to the payment of premiums. American Employers also says that the Rating Plan was a separate agreement, still in force after the settlement. Appellant would thus have this court interpret the final settlement agreement as applying (though it does not say so) solely to claims pending or filed when the final settlement was executed in 1950.
 

 Appellant’s interpretation of the final settlement is flawed for three interrelated reasons. First of all, there is no evidence at all that the 1950 settlement contained any explicit or plain exception whatever, or that on its face and in its content it was anything other than a full settlement of all claims. This type of settlement or release is normally a full and final release.
 
 Inland Empire Builders, Inc. v. United States,
 
 424 F.2d 1370, 1376, 191 Ct.Cl. 742 (1970). Moreover, American Employers’ current interpretation (that nevertheless the agreement must have excepted claims not filed or reported at the time of the settlement) would defeat the very purpose of the Contract Settlement Act of 1944. The objective of the Act was to effectuate speedy and final settlement of claims for wartime contracts.
 
 Condenser Serv. & Eng’g Co. v. United States,
 
 128 F.Supp. 148, 150, 130 Ct.Cl. 714 (1955). In order to proceed smoothly into a peace-time economy, Congress perceived the need to quickly cancel and satisfy the fiscal claims on war-time contracts. Procedures for contract cancellation prior to the Act were cumbersome and the delays considered injurious to the economy. It was with these concerns in mind that Congress passed the Act which had as its goals to speedily, fairly, and efficiently terminate war-time contracts. S.Rep. No. 836, 78th Cong., 2d Sess.,
 
 reprinted in
 
 1944 U.S.Code Cong.
 

 
 *704
 
 Serv., 1161, 1162-63. The text of the Act,
 
 supra,
 
 bears out this purpose to achieve “final and conclusive” settlements in the absence of a clear exception. What appellant asks this court to do is consider only a portion of the settlement between it and the Government as final—though the words of the settlement agreement would apparently reveal no such partial purpose— leaving all incurred but not reported injuries outside of the scope of the settlement, and therefore unsettled. To do so would be directly contrary to the intent of the Act as written. As the House Special Committee on Post-War Economic Policy and Planning stated with regard to the Act:
 

 When a settlement is made, it should be final and conclusive except for fraud or upon renegotiation to eliminate excess profits under the Renegotiation Act.
 

 ... It must be expected that both the contractor and the contracting officer will be reluctant to enter into an agreement in a mutually cooperative spirit of give and take, when a review of the negotiation can upset the concessions upon which the settlement has been made.
 

 H.R.Res. No. 408, 78th Cong., 2d Sess. 7 (1944). It is clear that Congress did not intend, unless there was a plain or explicit exception, to leave contracts open and unsettled for decades. Rather, Congress wanted to end with finality war-time contracts and move swiftly into a peace-time economy.
 

 Second, the Rating Plan, by its own terms, sets out a procedure for a
 
 final
 
 determination of the premium to be made after termination of the policy. That Plan provided that final settlement of claims be made within eight months of the termination of the policy. The undisputed facts show that the parties entered into a subsequent agreement under which final settlement (under the Rating Plan) was deferred for approximately 245 weeks from the expiration or termination date of the policy (1948). Accordingly, even if this court were to accept appellant’s argument that the Rating Plan was somehow incorporated into the final settlement agreement (or was a separate agreement between the parties) the Rating Plan would, by its own terms, expire within a finite period after termination of the policy—in this instance, within the 245 weeks expressly provided by the parties. That date was long past when this action was commenced.
 

 Finally, the hard fact is that appellant never requested that a reserve be set aside for future claims that might be filed after the final settlement had been reached. A failure at least to request a reserve in these circumstances serves to show an effective release from all future claims.
 
 Fisher v. United States,
 
 608 F.2d 435, 439, 221 Ct.Cl. 316 (1979);
 
 Rixon Elecs. Inc. v. United States,
 
 536 F.2d 1345, 1353-54, 210 Ct.Cl. 309 (1976). The mere fact that the parties did not discuss the possibility of claims being filed years after the final settlement leads to no other result. Mere silence by the parties is not tantamount to a mutual agreement to exclude. Nor are we persuaded by appellant’s argument that there was no release because the Maritime Commission’s representative had no authority to set aside reserves for incurred but not yet reported injuries. As the Claims Court said: “The limited authority of the Maritime Commission representative did not foreclose [American Employers] from raising the issue during the negotiations, or necessarily preordain the response of the Commission.” Furthermore, as a basic principle of the Act, Congress provided that
 

 [t]he full responsibility for settling terminated war contracts has been placed squarely upon the shoulders of the contracting agencies and they cannot escape that responsibility. The contracting agencies who made the contracts, are familiar with the contracts, and any attempt to let them escape their responsibility of properly settling such contracts in case of termination must be avoided.
 

 S.Rep. No. 986, 78th Cong., 2d Sess.,
 
 reprinted in
 
 1944 U.S. Code Cong. & Serv. 1161, 1162. It was incumbent on appellant to attempt to negotiate a settlement that was satisfactory to its own interests and to
 
 *705
 
 press for that position.
 
 [4]
 
 As Judge Mayer pointed out, if the Maritime Commission had denied American Employers a request for reserves, appellants would have had the option to resort to the arbitration provisions of the Rating Plan. We are convinced that the parties must be taken as having intended to execute a comprehensive and conclusive final settlement.
 

 B.
 
 Alleged Mutual Mistake,
 
 American Employers contend that, even though this court determines that the settlement agreement was final in all respects, the company should be entitled to reformation of the settlement under the doctrine of mutual mistake. The claim is that neither party contemplated the possibility that former employees would bring claims for latent occupational injuries years after final settlement. In general, reformation is an appropriate remedy when the contract terms do not accurately reflect the intention of the parties at the time of drafting.
 
 Olson Plumbing & Heating Co. v. United States,
 
 602 F.2d 950, 958, 221 Ct.Cl. 197 (1979). Reformation is also available as an equitable remedy when the parties to a contract have made a mutual mistake of fact.
 
 National Presto Indus. Inc. v. United States,
 
 338 F.2d 99, 167 Ct.Cl. 749 (1964),
 
 cert. denied,
 
 380 U.S. 962, 85 S.Ct. 1105, 14 L.Ed.2d 153 (1965). However, in this case the court determined that there was neither mutual mistake nor a drafting error; rather, if anything appellant had made a unilateral mistake. We concur. There was, as the Claims Court pointed out, sufficient information about latent occupational diseases available to the parties at that time.
 
 [5]
 
 Appellant, as an experienced insurer, should have had the foresight to negotiate a final settlement with the possibility of these diseases in mind. In most circumstances, reformation is not available for unilateral mistake and the contractor bears the risk of its own error. American Employers has not-tried to show the existence of fraud, misrepresentation, or deceit which would provide an exception to this general rule.
 
 See
 
 3 Corbin, Contracts § 608 (2d ed. 1960) at 586. In this particular case, it may be that neither side actually predicted or considered the possibility that former employees would bring workers’ compensation claims for asbestos-related injuries years after a final settlement had been reached. Nevertheless, it was reasonable, in light of available information, for American Employers to have taken account of that possibility and to have negotiated a final settlement with that chance in mind.
 
 Johnson, Drake & Piper, Inc. v. United States,
 
 531 F.2d 1037, 1047, 209 Ct.Cl. 313 (1976). Appellant is therefore barred from using mistake as an excuse for the negotiated contract that was actually made, and its request for reformation must be denied.
 
 McNamara Constr. v. United States,
 
 509 F.2d 1166, 206 Ct.Cl. 1 (1975).
 

 AFFIRMED.
 

 [1]
 

 . The Claims Court decided the case on cross-motions for summary judgment, preceded by extensive discovery and stipulations. At the oral argument in this court, both parties disavowed the need for a trial and therefore we can properly assume that there are no genuine issues of fact.
 

 [2]
 

 . The parties have been unable to locate (1) the insurance policy issued by appellant to Bethlehem-Alameda, (2) the 1948 assignment by Bethlehem-Alameda to the Maritime Commission, or (3) the actual final settlement agreement—but it is clear that these documents in fact existed.
 

 [3]
 

 . The court’s decision was not published.
 

 [4]
 

 . The solid indication that American Employers was sufficiently aware in 1950 of the possibility of future asbestos-caused injuries is referred to in subpart B,
 
 infra, Alleged Mutual Mistake.
 

 To the extent that appellant urges that the 1948 assignment itself imposed on the Government a continuing liability for premiums, the short answer is that that assignment preceded the 1950 settlement agreement and was therefore swallowed by the settlement agreement, no exception having been made for it.
 

 [5]
 

 . The court said: “At least [appellant’s] then attorney knew the risks of insuring against latent occupational diseases____’’ The record also contains ample material that even at that time insurance companies were aware of the possibilities of silicosis and asbestos claims surfacing in the future.