**PETERSON BUILDERS, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 91–1406C.**

United States Court of Federal Claims.

Oct. 26, 1995.

Maurice J. Mountain, McLean, Virginia, for plaintiff.

Mary Smith, with whom were Assistant Attorney General Frank W. Hunger, David M. Cohen, and Donald Kinner, Washington, DC, for defendant. Robert E. Lieblich, Naval Sea Systems Command, of counsel.

## OPINION

BRUGGINK, Judge.

Trial on Count I of this action was held in Washington, D.C. between October 17–24, 1995. A bench ruling in favor of the Government was entered at the conclusion of trial. This written order takes the place of that bench ruling.

This action arises out of a contract between Peterson Builders, Inc. ("PBI"), a manufacturer of wooden hulled ships, and the Government, acting through the Naval Sea Systems Command ("NAVSEA"). The contract, signed on June 29, 1982, called for PBI to design and build a new type of mine sweeper, called the MCM. The original agreement called for PBI to be paid its costs, plus an incentive fee, for designing and building the first of these ships, the MCM–1. Follow-on contracts for other MCM ships were separately awarded at a later time. In July 1985, the parties executed Modification P00011 ("Modification"), which converted the contract to one for costs, plus an incentive fee, but subject to a fixed cap.[1]

A six count complaint was filed on September 5, 1991. The action was transferred to this judge on February 10, 1995. Counts II, III, V and VI of the complaint have been previously dismissed. Count IV is still pending. Count I asserts that the Modification to the MCM–1 contract should be set aside and the contract should revert to a cost-plus basis because it was negotiated on the basis of a mutual mistake of fact. Specifically, PBI alleged that both parties believed that the

---

1. The Modification set the initial cap at $99.9 million. As a result of negotiated changes the cap was raised to $104,879,001.99. Stip. 267.

PBI expended $113,600,499.54 in completing the ship. *Id.* The target fee for the contract was $3,262,312.43.

detail design of the ship was substantially complete in July 1985 and that, based on this belief, the parties entered into a modification capping the allowable costs under the contract. According to PBI this belief was erroneous, and the detail design underwent numerous changes after the cap was imposed. Ultimately the cost at completion exceeded the cap by $8,721,497.55. *See* Stip. 267.

In order to prevail at trial PBI had to show four things:

1. that in negotiating the Modification, the Navy and PBI were mistaken in their belief regarding a fact;

2. that the mistaken belief constituted a basic assumption underlying the Modification;

3. that the mistake had a material effect on the bargain; and,

4. that the Modification did not put the risk of that mistake on PBI.

*Dairyland Power Coop. v. United States,* 16 F.3d 1197, 1202 (Fed.Cir.1994) (citing *Atlas Corp. v. United States,* 895 F.2d 745, 750 (Fed.Cir.), *cert. denied,* 498 U.S. 811, 111 S.Ct. 46, 112 L.Ed.2d 22 (1990)). After considering the evidence and stipulations, the court finds that PBI has failed to establish three of these elements: the first, the second and the fourth.

*1. The parties did not share a mistake of fact in July 1985.*

■ PBI alleges that the parties jointly were under the impression in July 1985 that the detail design [2] for the MCM–1 was essentially complete and that the ship was defined in "construction detail." [3] PBI does not assert that the parties were ignorant about the then-current state of government-initiated changes. An effort had been made to identify those changes and bring them into pricing negotiations. What is alleged is that the detail design was not as stable in the summer of 1985 as the parties assumed. PBI contends that the numerous contract modifications and resulting design changes which took place after the Modification was negotiated in July 1985 demonstrates that this assumption was incorrect.

■ A mistake on the part of one party will not provide a basis for rescission, particularly where the mistake is based on an unwarranted assumption of the party who should have known better in light of its experience. *McNamara Constr. of Manitoba, Ltd. v. United States,* 206 Ct.Cl. 1, 10, 509 F.2d 1166, 1171 (1975). While the court is prepared to assume that PBI officials believed that the detail design was stable enough in the summer of 1985 to negotiate a price cap, the court finds that the assumption that the detail design was complete was an unreasonable one. Mr. John Soderlund, a Vice President of PBI at the time, testified that changes in detail design normally continue throughout construction and testing and that a design cannot be viewed as complete until after acceptance. Furthermore, it has been stipulated that all of the difficulties encountered in the construction and testing of the MCM–1 following the Modification were typical of those encountered in designing a lead ship. Stip. 228; *see also* Stip. 226. In Mr. Soderlund's view, only the "construction detail" was substantially complete. He stated that although the Navy, in his view, committed to making no more unnecessary or cosmetic changes, he recognized that there was always the possibility of changes prompted by safety concerns or changes that were "mission critical." He referred to the design process as "evolutionary." Mr. Peterson himself explained that changes in the

---

2. It was PBI's responsibility to develop a detail design for the ship. This consists of hundreds of detailed drawings which could then be used by PBI or others to construct follow-on ships. It is distinct from the contract design and specifications which are furnished by the Navy as general instructions to PBI on what the Navy wanted in the MCM. PBI, along with its design subcontractor, the J.J. Henry Company, used the contract design and specifications to develop the actual layout and construction of the ship.

3. Construction detail is but one aspect of the detail design. To say that the construction detail is substantially complete means that the drawings necessary to actually build the ship have been completed. The fact that a drawing is complete and is defined in "construction detail" does not necessarily mean that the drawing will not change while the ship is being built and equipment is being installed. Until the drawings are complete and the ship is built it cannot be said that the detail design is complete.

construction drawings, and hence, in the detail design, can occur after an attempt is made to install equipment. At the time of the Modification, there was very little equipment installed in the MCM–1 hull.

This is consistent with the testimony of Mr. Sidney Tronic, the Procurement Contracting Officer, and Mr. Frank Sheridan, Assistant Deputy Commander for Contracts at NAVSEA. Yes, they wanted to avoid making any more contract drawing changes; yes, Admiral E.B. Fowler, Commander of NAVSEA, had initiated the negotiation process on the assumption that all known changes would be captured; and yes, Mr. Everett Pyatt, Assistant Secretary of the Navy, had rejected the first attempt at an agreement because it did not capture all the outstanding changes as of June, 1985. But to say that the construction detail design accounted for all *known* changes, is not to say that the detail design was essentially complete.

Further, while the parties stipulated that there were hundreds of contract changes and modifications after the July 1985 Modification, there is no proof that the resulting changes to the detail design were inconsistent with the assumption that the parties shared: namely that contract changes would be limited to the non-cosmetic. PBI did not establish that the subsequent changes were in categories beyond those anticipated, namely those predicated on equipment installation, acceptance testing, "mission critical" considerations, or safety concerns. The only changes on which there was testimony fall into the latter two categories: the need to redesign the fuel tanks and the need to install a halon fire suppression system in the engine room.

It follows that, even if PBI officials believed the detail design to be stable, Navy officials did not share that assumption. In part, that is due to the relative differences in the amount of detailed knowledge held by the parties. Although the Navy had a great deal of knowledge regarding the state of development of the ship, it was ultimately dependent on PBI for most of that information. To the extent the Navy had monthly budget reports, was briefed quarterly on the design status,

and participated in specific design changes, the court finds that neither Messrs. Tronic, Sheridan, Fowler, nor Pyatt had an overall level of understanding of the detail design comparable to PBI's. Therefore, the court finds that the Navy had no independent belief with regard to the status of the detail design.

■ In substance what PBI has alleged is that the parties shared a mutual expectation that there would be relatively few contract changes after the Modification. That highlights, however, the problem with this claim. To support reformation, a mistaken assumption of fact must be with regard to something that can be contemporaneously verified, i.e., a fact that can be independently and objectively established at the time the contract is entered into. As the Fourth Circuit taught in *United States v. Garland,* 122 F.2d 118, 122 (4th Cir.), *cert. denied,* 314 U.S. 685, 62 S.Ct. 189, 86 L.Ed. 548 (1941), "A mutual mistake in prophecy or opinion may not be taken as a ground for rescission where such mistake became evident through the passage of time." Here, the so-called fact, by its very nature, is no more than a prediction. It is an effort to guess at future costs, based on the anticipated non-occurrence of an event—namely, numerous change orders.

*2. The parties did not share a mistake of fact that constituted a basic assumption underlying the Modification.*

While the level of completion of the detail was an assumption used by PBI in negotiating the cap, it was not a mutual assumption. Some of the Navy personnel probably believed, to the extent they thought about it, that the number of contract changes would slow down. But the court is persuaded that, by the time negotiations concluded, the Navy negotiators were not at all concerned about the level of completion of the detail design, something they correctly viewed as a contractor responsibility. In fact, Messrs. Tronic and Sheridan testified that the status of the detail design was never discussed during the negotiations leading up to Modification P00011 and it did not enter into their thinking. To the extent that the Navy had a belief regarding the completeness of the de-

tail design, the court finds that this belief did not constitute a basic assumption underlying the Modification. The Navy was not concerned with the status of the detail design. Mr. Tronic testified that the Navy's prime motivating factor in converting the contract was to limit the Government's liability. He felt that by capping the contract, the projected cost at completion could be determined and the conversion would give PBI an added incentive to contain costs. Mr. Sheridan concurred with these statements.

The only relevant fact for them was that it was possible to price a cap, based on known changes, and that Secretary Lehman insisted on a cap. The Navy hoped that there would be no contract modifications, but that hope was not essential to attempting to negotiate a limit to its liability. Because the Navy wished to cap the contract regardless of the status of the detail design, the status of the design cannot have been a mutual assumption relied on by the parties in entering into the Modification.

### 3. Did the mistake have a material effect on the bargain?

In light of the lack of evidence as to the other elements, it is unnecessary to make a finding with respect to whether the mistake, if any, had a material effect on the bargain.

### 4. The Modification placed the risk of mistake on the contractor.

The circumstance with which PBI was confronted was, in legal significance, no different than a typical negotiating situation in which a contractor attempts to estimate future costs of performance. A contractor exercises its best judgment about whether it will be in a

profit or loss position at the end of the contract. It is important to recognize, in this regard, that Modification P00011 obligated the Government to pay for changes in design for which it was responsible. As to the contract work as it existed in July 1985, however, the Modification put the risk of correctly estimating excess costs on the contractor, just as it put the risk of underestimating costs on the Navy.

In this respect, it is noteworthy that Mr. Richard Seiler, PBI's former cost accounting manager, testified that PBI's estimated cost at completion had increased from the time the April proposal was submitted until the time of final negotiations in July. Furthermore, Mr. Soderlund testified that the Navy's foot dragging with regard to administration issues was no different after the Modification then it was before. These circumstances, coupled with the seemingly endless array of changes directed by the Navy, many of which were not yet fully implemented, should have put PBI on notice that pricing the cost to complete the detail design would be a guess. PBI is an experienced shipbuilder and based on the history and tumultuousness of the evolution of the detailed design, PBI should have kept the possibility of future changes to the detail design in mind when negotiating the Modification. *See American Employers Ins. Co. v. United States*, 812 F.2d 700, 705 (Fed.Cir.1987). By failing to take such a possibility into account, PBI assumed the risk that costs would exceed the cap.

As to post-July 1985 changes, it is stipulated that the Navy paid for all the changes it directed. Stip. 235. The net result is that either PBI mispriced the cost of the work as it actually stood in July 1985,[4] or it mispriced the effect of all the change orders for which

4. Mr. Soderlund testified, that, as of the time of negotiations, PBI had not fully accounted for all of the impact of pre-July 1985 contract changes on the detail design. For example, the drawings and specifications furnished to PBI had to be significantly altered to allow for improvements in foundation design. Although those changes had taken place, PBI continued to encounter fallout from those changes in terms of pipes that had to be redesigned to fit into the limited space available. By agreeing to enter into negotiations to price the work to completion, PBI undertook the risk of correctly estimating the impact of these earlier changes.

The court is sympathetic to the contractor in its attempts, in good faith, to negotiate the impact of the numerous changes made necessary by an apparently poorly developed initial design. Nevertheless, PBI had the option of refusing to negotiate and to stick with the original cost-plus contract, despite threats of no further funding for follow-on ships on which it wished to compete. PBI chose to enter into those negotiations, and elected thereby to do the best job it could in predicting completion costs *for the work, as it was then understood.*

it was subsequently paid. Each one of the negotiated changes contained a release. Ms. Sandra Orsted, Contract Administrator for PBI, testified that, to the best of her knowledge, all the negotiated changes made demands for impact and delay. Both the original contract, as well as the Modification,[5] and the negotiations leading up to it, made it clear that the contractor bore the risk of correctly guessing the cost of performing the work as then defined. The Government only agreed to pay for subsequent changes that it directed, and it did so. The real problem for PBI is that the bilateral changes apparently did not make a sufficient allowance for cumulative impact and delay.[6]

## CONCLUSION

The parties entered into tough negotiations, with each operating under different assumptions and pressures. PBI exercised its business judgment about future costs and underestimated those costs. That error does not constitute a legally actionable mutual mistake of fact. Accordingly, Count I is dismissed. The parties are directed to file a joint status report proposing a pre-trial schedule for Count IV on or before Wednesday, November 8, 1995. The report may be filed by plaintiff on behalf of both parties.

---

5. In the original contract, PBI assumed the responsibility to develop a detail design. The parties stipulated that "PBI understood that the intended effect of Modification P00011 was to put a ceiling on the Navy's liability for any costs incurred by PBI in complying with PBI's contractual obligations that remained to be performed when the modification was signed." Stip. 218. As the parties further stipulated, they did not, during negotiations for the Modification, discuss having the Navy assume the risk that detail design had not been adequately prepared. Stip. 201.

6. The fact that personnel from the Navy assisted in developing certain aspects of the detail design does not mean that the Navy assumed mutual risk in the detail design effort. Nor would it mean that the Navy was more generally aware of the status of the detail design. At most it would indicate that the Navy was aware of the status of those specific drawings. Even though the parties cooperated a great deal on changes and problem solving, the Navy did not enter into a joint enterprise with PBI in developing the design of the ship. *See National Presto Indus. v. United States,* 167 Ct.Cl. 749, 764, 338 F.2d 99, 109 (1964), *cert. denied,* 380 U.S. 962, 85 S.Ct. 1105, 14 L.Ed.2d 153 (1965). At all times the obligation to complete the detail design remained with PBI.