**PETERSON BUILDERS, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 91–1406C.**

United States Court of Federal Claims.

Feb. 28, 1997.

William E. Hughes, III, Milwaukee, Wisconsin, for plaintiff. Maurice J. Mountain, McLean, Virginia, of counsel.

Donald E. Kinner and Mary L. Smith, Department of Justice, with whom were Frank W. Hunger, Assistant Attorney Gen-

eral, and David M. Cohen, Director, all of Washington, D.C., for defendant. Robert E. Lieblich, Arlington, Virginia, of counsel.

## OPINION

BRUGGINK, Judge.

This action arises out of a contract between Peterson Builders, Inc. (PBI) and the United States Department of the Navy ("Navy"). It is brought pursuant to the Contract Disputes Act (CDA), 41 U.S.C. §§ 601–613 (1994). Presently pending are the parties' cross-motions for summary judgment on the only remaining count, Count IV. Oral argument was held on January 28, 1997. For the reasons set forth herein, plaintiff's motion is denied and the Government's motion for summary judgment is granted.

## BACKGROUND [1]

In the 1980s, the Navy had a shortage of adequate minecraft and had not developed or made any new minecraft since the 1950s. With only a few of the mine warfare ships still operational, the Navy made it a priority to add a new class of minecraft to its fleet to replace the remnants of the thirty-year-old class of ships.

The Navy did not have a design in existence from which a modern minesweeper could be constructed. Instead, it developed the basic requirements for a new class of wooden-hulled minesweepers. The requirements, known as the contract design and ship specifications (contract design), described the desired end product in terms of its general dimensions and capabilities, but did not provide the particular details of how it would be built.

Because the Navy wanted to build a class of ships, its first priority was to have an initial contractor build a prototype vessel, using the contract design. This vessel would be known as MCM–1. The specific drawings generated by that contractor, showing how the prototype was successfully built, would then be passed on to builders of subsequent ships, the MCMs 2 through 8, not as an obligatory blueprint, but as an aid to construction.

The Navy selected PBI to design and build the prototype MCM–1. The contract, based on cost plus an incentive fee, was executed in June, 1982. The contract made PBI responsible for developing a detail design.[2] In turn, as part of PBI's obligation to provide "lead yard services," it would furnish to the Navy "all lead ship design drawings and construction drawings and drawings supporting construction" along with "all planning and production data, weight data, provisioning data, CFE listing, engineering data, purchase specifications, and all information for the planning, construction, fitting out, test and delivery of follow-on ships." MCM–1 Contract, Item 007.

The Navy had the right to make changes to the contract design during construction of the MCM–1, and did so extensively. There is no question that all the changes it ordered to the contract design, including the spill-over effect onto PBI's development of its detail design, have been paid for.

On May 2, 1983, the Navy awarded a contract for the production of the first follow-on ship, the MCM–2, to Marinette Marine Corporation ("Marinette"). It was understood that PBI would not have completed the MCM–1 when follow ships were initiated. Instead, as portions of the detail design were completed, they would then be available to the Navy and to Marinette. The original delivery date of the MCM–1 was thirty-nine months from the date of contract award. Marinette established a production schedule for the first follow ship that was only a few months behind the milestone dates of PBI under the MCM–1 contract.

In June, 1983, the Navy entered into another contract with PBI for it to furnish "lead yard services" directly to Marinette and other subsequent follow-ship builders (the LYS contract). This contract obligated

---

1. The facts are taken from the parties' August 11, 1995 joint stipulations of fact.

2. The detail design was defined in the MCM–1 contract as comprising "the total engineering, design, technical and other support and planning

required to develop the documentation necessary for construction, check-out, test, fitting out and acceptance of the lead ship....'' Section C. Item 0001.

PBI to pass on directly to those builders its detail design. The purpose of this arrangement was to accelerate and make more efficient the transmission of the presumably helpful detail design as it emerged, piece by piece, from the MCM–1 contract.

On December 23, 1983, the Navy awarded a fixed-price contract to PBI with cost escalation for the construction of two follow ships, the MCM–3 and the MCM–5. On August 20, 1986, the Navy awarded construction of the MCM–6 and the MCM–8 to PBI and of the MCM–7 to Marinette. It is the MCM–3/5 and MCM–6/8 contracts that form the basis for the present suit.

The MCM–3/5 contract obligated PBI to build in accordance with the contract design and ship specification, but stated that it could use the detail design drawings being developed by PBI for the MCM–1. Attached to all the follow contracts was a copy of the LYS contract.

PBI, in other words, played two roles in the building of the MCM class of ships. Its first role was that of the lead-ship builder under the MCM–1 and LYS contracts. This included the obligations of designing and building the MCM–1, and then passing on that design, piecemeal, to contractors responsible for building the follow ships. PBI's second role was that of follow-ship builder. Because PBI was building MCM–3/5 at the same time it was still working on MCM–1, it was preparing detail designs that it and Marinette were waiting to use.

Ideally, PBI would have completed the detail design of portions of the lead ship before those same portions were started on the follow ships. This would have ensured, as long as the detail design was correct, that there would be no need to build any part of the follow ships more than once.

Things did not work out this way. There were many delays and changes on the MCM–1. Although it was launched on June 15, 1985, the Navy did not formally accept the MCM–1 until August 28, 1987, long after both the MCM–3/5 and the MCM–6/8 contracts had been awarded. Some of the initial difficulties encountered arose because of eight design features which the parties to the

MCM–1 contract understood were unresolved at the time it was executed. These items, which came to be known as "the Big 8," were deleted by the Navy from the original scope of the contract work in order to lower its projected cost. The parties anticipated that, following contract award, they would be able to conduct a more detailed analysis of the technical requirements of "the Big 8" items and negotiate an increase to the original contract price. It took nearly thirteen months, however, for the parties to reach agreement on these unresolved issues. No time was added to the contract when these items initially were added back. In September 1983, the parties to the MCM–1 contract executed a memorandum agreement to compensate PBI for disruption costs in connection with prior or future change orders, including changes in connection with the Big 8.

In August 1985, the parties signed Modification 11 to the MCM–1 contract, changing it from a cost-plus-incentive-fee contract to a cost-plus-incentive-fee-with-a-ceiling contract. As of that date, almost all of PBI's detail design drawings on the prototype ship had been completed and validated by its design subcontractor, J.J. Henry Company. Nevertheless, even after this date, contract design changes continued, resulting in even more detail design changes. The Navy issued more than 300 contract design changes and PBI issued more than 8,000 "Engineering Change Notices" to the detail design to itself or Marinette as follow-on contractors.

The parties agree that the Navy has compensated PBI for every contract design change in MCM–1 and in MCM–3/5, including the impact of contract design changes on the detail design drawings.

One factual issue has to be clarified. PBI furnished, as part of its briefing materials, the affidavit of its former Vice President of Program Management, John Soderland. Mr. Soderland made two statements in his affidavit that were explained by plaintiff's counsel during oral argument. Mr. Soderland stated that PBI "relied upon representations that the detail design would be available in a timely manner and would be suitable for constructing the follow ships in a reasonable

production manner." He also states that "[b]ased on the nine-month gap which was to exist between the MCM–1 and the MCM–3/5 programs and based on the Navy's representations, PBI reasonably expected to receive the detail design information it would need prior to the initiation of the various stages of construction of MCM–3/5 and MCM–6/8." During oral argument, counsel for plaintiff explained that Mr. Soderland did not mean to give the impression that there were negotiations or oral representations underlying these statements. Whatever "representations" emanated from the Navy came from the contract documents.

Count IV[3] asserts a claim under the MCM–3/5 and MCM–6/8 follow-ship contracts. PBI essentially makes two allegations. The first is that the "Navy warranted that the design data obtained from the lead ship program could be used without change to construct, outfit, test and trial [sic] the MCM Class follow ships." Complaint ¶ 111. PBI alleges that this warranty of design was breached through the way PBI, as follow-ship builder, received the detail design.

The second argument is that the Navy's failure to give PBI a detail design as advertised constituted a constructive change in PBI's follow-ship contracts. The unduly protracted evolution of the design of MCM–1, in other words, resulted in "modifications to the prototype vessel that in combination added significantly to the scope of work for all the follow ships of the MCM Class." Complaint ¶ 111. PBI contends that it incurred addi-tional costs on the MCM–3/5 contract of over $12 million, and nearly $3 million on the MCM–6/8. In addition, it alleges that it incurred over $6 million in delay costs on the two follow-on contracts.

## DISCUSSION

This is an unusual case. PBI concedes that it was able to build ships that met the contract design requirements, as amended. Moreover, PBI does not contend that it was unable to build the MCM 3, 5, 6 and 8 ships according to the final detail design.[4] It admits that it has been paid for all contract design changes on the follow ships, including costs for changes in the detail design that resulted from the changes to the contract design.[5] Because the Government did not directly furnish the detail design, the question naturally arises, "What is it that the Navy allegedly warranted or promised?" PBI's factual and legal contentions were better explained during oral argument. For that reason, the court has quoted liberally from that transcript herein.

a. Breach of Warranty of Specifications

 PBI contends that the Navy's conduct here constituted a breach of the implied warranty of specifications. When the government furnishes specifications and either requires the contractor to build to those specifications, or represents that the contractor can produce a successful product if it does, then an implied warranty of the fitness

---

**3.** The action was commenced in 1991. Count VI was settled almost immediately and dismissed. Counts II, III and V were dismissed on May 5, 1992, in an unpublished opinion by the judge previously assigned to this case. The action was transferred to this judge in February 1995. Count I was tried in October, 1995. That count sought recision of Modification P00011, which placed a cap on the Navy's liability with respect to the MCM–1 contract. The court rejected PBI's assertion that there was a mutual mistake of fact as to the status of the detail design drawings. *Peterson Builders, Inc. v. United States*, 34 Fed.Cl. 182 (1995).

**4.** Plaintiff's counsel, during oral argument, stated that "[t]his is not a case of ... impossible specifications." Tr. at 5.

**5.** The following occurred during oral argument:

THE COURT: Am I right in thinking that if a detail design on the MCM–3/5, or the MCM–1 for that matter, was changed due to a contract design change, that the fall out from that, so to speak, has been paid for?
MR. HUGHES: Yes. If there—yes, if there had been changes in the contract specifications, Peterson Builders has acknowledged that it has been paid for changes resulting from that change.
THE COURT: Including changes in the detail design?
MR. HUGHES: Yes.
THE COURT: All right. So the changes we are talking about are changes in the detail design that were due to an inadequate detail design for some reason other than a change in the contract specifications?
MR. HUGHES: That's correct.
Tr. at 15–16.

of those specifications arises. *See United States v. Spearin,* 248 U.S. 132, 136, 39 S.Ct. 59, 61, 63 L.Ed. 166 (1918). PBI quotes from Nash & Cibinic's treatise, *Administration of Government Contracts,* (3d ed. 1995), to the following effect:

> [T]he Government generally will be liable if the details that it specifies create problems that the contractor could not reasonably foresee. The legal theory used in such cases is the implied warranty of specifications, which allocates the risk to the Government when the specifications it furnishes are not suitable for their intended purpose.

PBI cites this language and a number of decisions to support the propositions that "a contractor is entitled to assume that parts manufactured in compliance with prescribed dimensions and permitted tolerances will function properly," and that the implied warranty "entitles a contractor to rely upon the adequacy of the design information provided by the Government in formulating its bid price." PBI brief of July 1, 1996, at 7.

In trying to flesh out PBI's allegations, the court elicited, during oral argument, the following from counsel, "So ... what constituted a breach ...? Is it the quality of the detail design or is it the timeliness of it? Mr. Hughes: It would be a combination of both of those, Your Honor. In construction [of] the follow ships, Peterson Builders did not receive detail design[s] in a timely manner to permit it to proceed as required, and also there were defects in the detail design that required ... Peterson Builders to redo portions of the work." Tr. at 14.

There is an obvious irony in PBI's contention that the Government made any warranties about the design that PBI itself developed. PBI contends that this circumstance is not a bar to recovery. In principle, the court agrees. It is possible for the Government to contract with a design company to develop specifications, accept those specifications, and then contract with that same company to build according to those specifications. The Government may be held to

have warranted the suitability of those specifications. *See Hickman Sea Sled Co.,* ASBCA No 3008, 57–1 BCA ¶ 1177, 1957 WL 156 (1957).[6]

Whatever warranty the Navy allegedly breached, however, it did not include an implied warranty that the detail design was already in existence. Both parties were completely aware that the detail design did not exist at the time the follow ship contracts were executed. As counsel for PBI conceded, "It is a fact, since there was ... concurrency between the development contract and the construction contract that ... Peterson Builders would not be able to receive a completed detail design for the construction of the entire follow ships." Tr. at 6. At the time the MCM–3/5 contract was let, delivery of the final detail design by PBI, acting as lead-ship designer, was at least twelve months away. And if any entity should have known of problems in delivering MCM–1 on time, it was PBI. The Government, in short, did not "furnish" specifications prior to PBI's bid.

There are a number of other difficulties with PBI fitting itself into the typical specification warranty line of cases. The first is that the only promise that can be gleaned from the contract language is that the follow-on contractors would be furnished with the detail design as it was completed by PBI: "Data developed under the Lead Yard Services Contract ... will be provided by the Lead Yard Services Contractor." The parties are agreed that there was no contractual obligation for follow-ship contractors to adhere strictly to the detail design. PBI attaches to its brief, for example, excerpts from the deposition of Richard Goldsworthy, former Program Manager for the Navy at Sturgeon Bay, where PBI maintained its facilities. He testified as follows concerning ECN's issued by a lead-yard contractor, such as PBI: "It's the prerogative of the follow yard as to whether or not they would incorporate the ECN or not." Dep.Tr. at 59. He was asked whether he considered "the detail design information being provided by the

---

6. In *Hickman,* the Board found the Government responsible for the specifications concerning the propellers because, in the design contract, the

metallurgical composition of the propellers had been provided by the Government before the contractor began any design work.

lead yard contractor, Peterson Builders, to the follow yards to be [Government Furnished Information]?" He said, "No.... We were not warranting that the drawings ... met each and every requirement.... [I]n my opinion, the follow yards had the liberty to do their own detail design." Dep. Tr. at 110–11.

The statement in the MCM–3/5 contract that the Navy "intends that all MCM–1 Class Ships shall have an identical Class Design Baseline (CDBL)," is merely a reference to the underlying contract design. That indeed, was obligatory, but is not the subject of Count IV.

The most that can be deduced from the contract language, Goldsworthy's deposition, and the affidavit of retired Admiral Malcolm McKinnon III, is that the Navy expected follow-on contractors to use the detail design, and that economics dictated that they use it as much as possible to avoid having to implement the contract design from scratch. The Navy, in short did not warrant the suitability of the detail design, nor did it obligate PBI, in building the follow ships, to utilize the detail design as it emerged from PBI, the designer.

It cannot be contended, moreover, that either the contract specifications or the detail design were unsuited for their intended purpose. PBI, as follow ship builder, was able to implement the amended contract design. And to the extent the contract design was modified, it has been compensated. In addition, as counsel conceded, the Navy paid PBI for all the detail design changes that resulted from contract design changes. What remains as the subject of PBI's claim, by default therefore, are changes in the detail design prompted by some reason other than a change in the contract specifications. In other words, PBI is seeking compensation for costs arising out of changes in the detail design that were not prompted by Government changes in the contract design. By definition, these are PBI's own revisions to

the detail design, acting in its capacity as designer under the MCM–1 contract or the LYS contract.

In substance, PBI is complaining of instability in its own detail design. As counsel stated, "a correct detail design was eventually arrived at, albeit later than anticipated." Tr. at 17. The legal question thus posed by Count IV is whether the MCM–3/5 or MCM–6/8 contracts promised that the relevant pieces of the detail design would not be unstable during the development period, or would be available in final form within a certain period of time.

PBI places its reliance exclusively on provisions in the MCM–3/5 and LYS contracts. The following sections in the MCM–3/5 contract are central:

Section C, Item 0001:

A. Data developed under the Lead Yard Services Contract N00024–83–C–2119, that have an effect on the Contract Data Baseline[7] and the MCM–1 Class Standard Equipment list will be provided by the Lead Yard Services Contractor. See Attachment 1 hereto.

. . . .

D. The Government intends that all MCM–1 Class Ships shall have an identical Class Design Baseline (CDBL). When the Contractor identifies a component or equipment for procurement which is not identical to that specified in the MCM Class construction documentation, the Contractor shall submit the procurement documentation to the Lead Yard Services Contractor.

Attachment 1 to the MCM 3/5 contract was the LYS Contract. That contract, in turn, contains the following provision upon which PBI relies:

Section 1.5. *Provide design and Construction Documentation to Follow Yard:*

The Contractor shall assemble and provide copies of data and documentation,

---

**7.** There was confusion during oral argument as to what the distinction was between the contract data baseline and the class design baseline. Ms. Sandy Orsted, who plaintiff's counsel relied on to speak on behalf of the plaintiff at oral argument, and who furnished an affidavit, stated that the

class design baseline consisted of the fundamental contract design documents, and not the detail drawings. The Government does not disagree with that. The contract data baseline apparently does include the current version of the detail drawings.

which were prepared under the lead ship contract and are necessary to construct follow ships, to the follow yard. A minimum list of documentation and data to be assembled by the Contractor is provided in Attachment "3".

Attachment 3 to the LYS contract is the LYS plan, drafted by PBI. Table 3.1 in the LYS plan includes a list of technical documents and construction drawings that PBI was required to furnish under the LYS contract. In addition, the LYS plan contained the following explanation of the Navy's expectations as to how the lead-yard services contractor would help the follow-ship contractors:

Section 1. Introduction:

The MCM–1 procurement program is intended to provide the benefits to the Government of detail design of the MCM–1 while retaining the reduced lead time inherent in the construction of the MCM–1 and subsequent ships of the class by a different shipbuilder. One of the primary actions needed to achieve this goal is standardization of all ships in the class. Implementation of this goal requires active and thorough interaction and liaison between Peterson Builders and Marinette Marine to ensure that all ships are as close to identical as feasible. This document discusses, in detail, the services to be provided by Peterson Builders to the follow yard.

Section 2.1. General:

The normal course of action in the procurement of a follow ship, which is nominally identical to the lead ship, is to use the detailed working drawings which were proven correct in the lead ship in the construction of the follow ship. In the MCM–1 Class procurement, it is planned that the follow-ship procurement process will begin before completion of the final design and construction of the lead ship. Under these conditions, it is impossible to provide a complete package of design information to the follow yard at the start of their contract. The adverse impact resulting from delivery design data after the start of the follow ship contract can be reduced through close interaction and liaison between the lead and follow yards. It

is the implementation of this philosophy which yields the description of lead-yard services contained herein.

Section 2.2. Broad Scope of Lead–Yard Services:

The implementation of lead-yard services will consist of the following broad areas of action:

. . . .

b. Provide continuing update of design data to follow yard.

Section 3. Lead-yard Services:

The following is a detailed description of the specific lead-yard services identified in paragraph 2.2.

Section 3.1. Provide Complete Design Data Set to Follow Yard:

Prior to contract award for the follow ship, Peterson Builders will provide a reproducible (washoff * * *lar) of all developed and validated design documents to the follow yard. Table 3–1 is a generic list of the MCM–1 design data which will be forwarded to the follow yard. This listing contains the items identified and selected by PBI as being of value to the follow shipbuilder in the program. It is recognized that this initial issue of data to the follow yard will be incomplete since the MCM–1 design, construction, and validation will not be complete at the time of follow-ship contract award. The documents which are outstanding at the time of initial issue of the data package will be forwarded to the follow yard promptly upon validation and subsequent drawing issue. This list will remain dynamic and when compared to the Design Agent's Drawing List, additions and deletions can be made.

Section 3.2. Provide Continuing Update of Design Data to the Follow Yard:

As new drawings and other documents are produced by the lead yard, or existing documents are revised by the lead yard, a copy of the document will be forwarded promptly to the follow yard.

Section 5.1. Introduction:

In order to enhance the ability of the follow-ship yards to economically build follow ships which are as identical as possible

to the lead ship, the lead-ship yard will provide assistance to the follow yard.

Section 6. Standardization:

Intraclass standardization is an inherent portion of the total class procurement program. It is intended that the MCM–1 design be used without modification in the construction of subsequent ships. This is implemented through the validation of MCM–1 drawings and the use of standardized major Contractor–Furnished equipment. The use of MCM–1 procurement information in the development of follow-ship material procurement will enhance the standardization of the class.

Section 8. Summary:

The use of lead-yard services will allow the construction of the MCM–1 and subsequent ships by two shipbuilders, while retaining a standard design of high commonality throughout the class. In addition, the use of lead yard services will allow the learning experience economies of serial-ship construction through the promulgation of lead-yard experience of lessons learned and design refinement to the follow yard. This concept will realize maximum efficiency across the entire spectrum of production resulting in a high degree of program cost management. The ultimate production learning should be reached earlier than with conventional, independent yard construction programs where there is no exchange of information.

The Navy's hopes and expectations as to how the detail design developed by the lead-ship contractor would be used by follow-on contractors are transparent from these provisions. It was the expectation that PBI would furnish the detail drawings to the follow-ship builders as a means of expediting their work. The lead ship contractor would be paid more to wrestle with the difficult design problems and identify at least one way that worked. The court rules, however, as a matter of law, that no promises were made to PBI as follow-ship contractor that the detail design would be static, reliable, or provided within a specific period of time. It is PBI that is undertaking obligations under the LYS Contract to furnish, as soon as they are ready, construction drawings and other elements of

the detail design to the follow-ship contractor, at that time only Marinette. The language quoted above is replete with statements, however, that the detail design is an organic, changing document, and, more importantly, that the process of furnishing the detail design to the follow-ship builders was a hope or expectancy, and not a warranty.

The Government points to Section 2.1 in the LYS plan to show that it was made clear that the detail design might not be ready in time for PBI to use as a follow-ship contractor. The court agrees. The plan makes it clear that the detail design would not be a static document, and that construction of the follow ships would have to proceed before it was complete. The lead-yard contractor is being warned, in effect, that others are looking to it to supply the drawings which, hopefully, will ensure both efficiency and greater uniformity in the final appearance of the entire class. Such statements as: "it is planned that the follow-ship procurement process will begin before completion of the final design and construction of the lead ship," "it is impossible to provide a complete package of design information to the follow yard at the start of their contract," "[i]t is recognized that this initial issue of data to the follow yard will be incomplete," and "[t]his list will remain dynamic and when compared to the Design Agent's Drawing List, additions and deletions can be made," are a clear warning to the follow-ship contractor that the Navy is making no warranty at all about the condition of the detail design or when it will be finalized.

That there was a distinct possibility of changes in previously-issued drawings was also highlighted: "As new drawings and other documents are produced by the lead yard, or existing documents are revised by the lead yard, a copy of the document will be forwarded promptly to the follow yard."

PBI's claim under the MCM–6/8 contract is even less colorable than its claim under the MCM–3/5 contract. There was no reference in the later contract to the LYS contract or to the receipt of verified MCM–1 design data. In response to a question, the Navy told bidders that "Any data developed by the Lead Yard has been and continues to be

available to the follow yard through Lead Yard Services. It is the responsibility of the follow yard to obtain the information." This is an accurate statement, however. Data was furnished.

The court concludes that the Navy made no implied warranty either as to the quality, stability, or timing of the detail specifications.

### b. Constructive Changes

 A compensable constructive change requires proof that the Government ordered a change from the contract requirements or was at fault in making the change necessary. *Al Johnson Constr. Co. v. United States,* 20 Cl.Ct. 184, 204 (1990). In this case, PBI contends that the Government ordered it to make changes in the detail designs of the follow ships. What has been said above, however, precludes liability on a theory of constructive change as well.

To recover, PBI has to demonstrate that the Government, in effect, ordered changes to the contract. The court will assume that PBI, as follow-ship builder, made changes in the detail designs of the follow ships prompted by a felt need to comply with ECN's issued by PBI in its MCM-1 design capacity. It is worth recalling, however, that these changes, by definition, were not changes prompted by the Navy's alteration of the contract design. What is missing here, in other words, are both elements of a constructive change—the element of change to a contract requirement and the element of compulsion or fault. The contract requirements were not altered, only the detail design. Nor did the follow-ship contractor have to adhere to the detail design, much less to changes in it.

The fact that the Navy wanted a high degree of commonality does not mean the ships had to be exactly alike. Two ships could meet the contract design and yet be different. The Navy utilized the LYS contractor to help in the goal of commonality and efficiency, but it never elevated that goal into a contract requirement, or for that matter, to a contractual representation. Because there was no breach of an implied warranty and no constructive change, the entire count is dismissed. Accordingly, it is unnecessary to address the Government's other arguments.

### CONCLUSION

For the reasons stated in this opinion, the plaintiff's motion for summary judgment is denied and the Government's motion for summary judgment is granted. The January 3, 1996 order of Judge Futey consolidated 95–182C with this case. Matters have proceeded separately and there is no reason to maintain the consolidation. Accordingly, Docket No. 95–182C is severed from this proceeding. The Clerk is directed to dismiss the complaint in Docket No. 91–1406C. No costs.