**DAIRYLAND POWER COOPERATIVE,**
Plaintiff–Appellant,

v.

**The UNITED STATES, Defendant–**
Appellee.

No. 93–5131.

United States Court of Appeals,
Federal Circuit.

Feb. 15, 1994.

---

Charles C. Thebaud, Jr., Newman & Holtzinger, of Washington, D.C., argued for plaintiff-appellant.

Anthony J. Ciccone, Attorney, Commercial Litigation Branch, Department of Justice, of Washington, D.C., argued for defendant-appellee. With him on the brief were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director and Jeanne E. Davidson, Assistant Director. Also on the brief were Marc Kasischke, Office of the General Counsel, Department of Energy, Washington, D.C. and Alan I. Handwerker, DOE Chicago Office of Counsel, Argonne, Illinois, of counsel.

Before NIES, Chief Judge, PLAGER and CLEVENGER, Circuit Judges.

CLEVENGER, Circuit Judge.

Dairyland Power Cooperative appeals the March 29, 1993 judgment of the United States Court of Federal Claims dismissing its complaint for failure to state a claim upon which relief can be granted. In ruling on the parties' cross-motions for summary judgment, the Court of Federal Claims held as matters of law that Dairyland's execution of a valid release discharging the Government from liability barred Dairyland's claim for contract damages and that the absence of mutual mistake of fact barred Dairyland's claim for contract reformation. *Dairyland Power Coop. v. United States,* 27 Fed.Cl. 805 (1993). We affirm.

I

This case involves a contract executed on June 6, 1962 between Dairyland and the U.S. Atomic Energy Commission (AEC) pursuant to which Dairyland on November 1, 1969 began operating a nuclear reactor plant constructed by AEC on a site owned by Dairyland near LaCrosse, Wisconsin. This contract obligated Dairyland to purchase the steam produced by the 50–megawatt La-Crosse boiling water nuclear reactor plant and to operate an adjacent turbine-generator facility constructed by Dairyland to convert the steam into electricity. The 1962 contract also provided for the offer for sale of the LaCrosse plant to Dairyland at AEC's option

after November 1, 1974 at the price of "the cost of construction [of the reactor plant] ... less appropriate depreciation." If Dairyland chose not to purchase the LaCrosse plant, the contract permitted AEC to dismantle the reactor plant subject to "mak[ing] the reactor site safe from the public health and safety standpoint."

In 1971, AEC began negotiating with Dairyland for the early sale of the LaCrosse plant after determining that AEC's "most pressing reactor development efforts" no longer included its participation in the La-Crosse project. Although the parties reached an agreement for the purchase of the LaCrosse plant by Dairyland for $2.75 million, Dairyland later declined to execute this agreement because it had originally underestimated the $2.7 million minimum cost actually required to obtain a full-term operating license. Ultimately, AEC and Dairyland executed a modification to the 1962 contract on August 6, 1973 (the 1973 sale contract), in which AEC agreed to convey title in the reactor plant, two nuclear fuel cores, and spare parts to Dairyland for one dollar. Despite the dramatic reduction in this purchase price from that contemplated in the 1971 negotiations, AEC's justification for the sale was its relief of "the [Government's] financial responsibility under the [1962] contract for the cost of operating and possibly decommissioning [the LaCrosse] reactor which has no further ... value [to AEC's reactor development mission]." The 1973 sale contract provided that upon the sale and transfer of title to the LaCrosse plant, the 1962 contract "shall thereupon cease to be effective and neither [Dairyland] nor the Government shall thereafter have any further rights or obligations thereunder."

AEC recognized that the LaCrosse plant's operational efficiency at the time of the 1973 sale contract made its economic value marginal compared to that of a fossil-fuel plant of similar size. AEC postulated, however, that if Dairyland could reduce costs through operating economies, Dairyland could offset its initial costs of plant modifications required to obtain a full-term operating license and continue operation of the LaCrosse plant.

Nonetheless, AEC admitted that "[i]n view of the nature of the risks assumed by [Dairyland] under the terms of the [1973 sale contract], the sale of the [LaCrosse] plant ... would not appear to result in a windfall to [Dairyland]." AEC noted the potential consequences for Dairyland to include the reduction of the plant's economic value to zero, the loss of use of the $7 million turbine-generator facility constructed by Dairyland, and the costs associated with decommissioning the LaCrosse plant. On the other hand, Dairyland also appreciated the implications of the sale, commenting that its purchase of the LaCrosse plant was "a calculated risk, a gamble ... that [Dairyland] can make this plant perform economically, for our power system."

Dairyland's commercial operation of the LaCrosse plant began on February 1, 1971. AEC granted Dairyland a provisional operating license on August 28, 1973. Although Dairyland applied for a full-term operating license on October 9, 1974, Dairyland never received such a license because it did not complete work necessary to bring the LaCrosse plant into compliance with safety standards set forth by the U.S. Nuclear Regulatory Commission (NRC). Dairyland permanently ceased operation of the LaCrosse plant on April 30, 1987.

In addition to the LaCrosse plant, Dairyland purchased the reactor's two nuclear fuel cores, which had an estimated value of $5.2 million after the costs of reprocessing the spent nuclear fuel contained in the cores into new usable nuclear fuel. Neither the original 1962 contract nor the 1973 sale contract, however, contained any reference to spent nuclear fuel reprocessing or disposal. At the time of the 1973 sale contract, Nuclear Fuel Services, Inc. (NFS) operated the only licensed commercial nuclear fuel reprocessing plant in the United States. Moreover, even NFS had suspended its reprocessing activity by then.

On March 14, 1975, Dairyland contracted with NFS for spent nuclear fuel reprocessing and storage with the understanding that 1988 would be the earliest possible date for re-

sumption of reprocessing. Dairyland and NFS, however, agreed to terminate the fuel reprocessing portion of the contract in a contract modification on September 15, 1976. On April 7, 1977, President Carter suspended indefinitely commercial reprocessing of nuclear fuel. Although President Reagan lifted the ban on commercial reprocessing on October 8, 1981, the reprocessing industry never revived.

Regarding nuclear fuel disposal, Congress established a Department of Energy (DOE) program in January 1983 for the permanent storage at federal repositories of spent fuel assemblies from commercial nuclear reactor plants. Nuclear Waste Policy Act of 1982, Pub.L. No. 97–425, 96 Stat. 2201 (1983) (codified at 42 U.S.C. §§ 10101–10226 (1988)). The earliest projected start of DOE storage operations, however, was the year 2010. The decommissioning plan for the LaCrosse plant approved on August 7, 1991 by the NRC required Dairyland to continue on-site storage of its spent fuel assemblies in compliance with the NRC's SAFSTOR guidelines. Dairyland estimates that SAFSTOR storage of its spent fuel assemblies until 2011, and the subsequent decommissioning of the LaCrosse plant, will cost over $97 million.

II

On October 12, 1990, Dairyland submitted to DOE an initial claim pursuant to the Contract Disputes Act of 1978 (CDA), 41 U.S.C. § 609(a)(1) (1988), seeking rescission of the 1973 sale contract, or contract damages in the alternative. The DOE Contracting Officer (CO) denied the claim without issuing a decision, determining that the claim was not cognizable under the CDA. Dairyland resubmitted its claim on May 1, 1991, and provided additional support for its claim on September 18, 1991. Before the CO issued a final decision on Dairyland's claim, however, Dairyland filed suit in the U.S. Claims Court * on December 9, 1991. In its complaint, Dairyland sought rescission of the 1973 sale contract based on the theories of commercial impracticability, frustration of

---

* Effective October 29, 1992, the U.S. Claims Court became the U.S. Court of Federal Claims. Federal Courts Administration Act of 1992, Pub.L. No. 102–572, § 902(a), 106 Stat. 4506, 4516.

purpose, and mutual mistake of fact. In the alternative, Dairyland sought contract damages of over $97 million in costs associated with decommissioning the LaCrosse plant.

On August 7, 1992, the Government filed a motion to dismiss under Rule 12(b)(4) of the Rules of the U.S. Court of Federal Claims (RCFC), or alternatively, for summary judgment under RCFC 56. Dairyland filed its cross-motion for summary judgment on October 19, 1992. Pursuant to RCFC 12(b)(4), the Court of Federal Claims treated the Government's motion to dismiss as a motion for summary judgment because the court considered materials beyond the pleadings.

The Court of Federal Claims found that Dairyland executed a valid unrestricted release in the 1973 sale contract that discharged the Government from any liability except in three specified instances not relevant to this case. *Dairyland*, 27 Fed.Cl. at 812. The release at issue reads:

> In consideration for the conveyance by [AEC] of title to the reactor plant, fuel cores and other [AEC] property to [Dairyland], ... [Dairyland] agrees that [AEC], its successors and assigns *shall not thereafter be obligated to [Dairyland] for any further claims, charges or demands whatsoever, under or pursuant to [the 1962 contract], or otherwise, and shall be relieved of all further obligations and responsibilities with regard to the [LaCrosse] reactor plant.* [Dairyland] agrees to accept such conveyance of title and shall pay [AEC] the sum of one dollar ($1.00). (emphasis added).

The Court of Federal Claims thus held that the existence of a valid release precluded Dairyland as a matter of law from obtaining the contract damages relief it sought. The Court of Federal Claims alternatively held that Dairyland could not as a matter of law establish a mutual mistake of fact, which would allow rescission or reformation of the 1973 sale contract. The court reasoned that Dairyland could not establish a mutual mistake of fact because the 1973 sale contract placed the risk on Dairyland that commercial reprocessing of spent nuclear fuel might become unavailable in the future. *See id.* at 813 (quoting *Atlas Corp. v. United States*,

895 F.2d 745, 750 (Fed.Cir.), *cert. denied*, 498 U.S. 811, 111 S.Ct. 46, 112 L.Ed.2d 22 (1990)) (reciting the fourth requirement to establish mutual mistake that the relevant contract not put the risk of the mistake on the party seeking reformation). The Court of Federal Claims therefore granted the Government's motion for summary judgment and denied Dairyland's cross-motion for summary judgment.

## III

This court reviews judgments of the Court of Federal Claims to determine whether they are premised on clearly erroneous factual determinations or otherwise incorrect as a matter of law. *Transamerica Ins. Corp. v. United States*, 973 F.2d 1572, 1576 (Fed.Cir.1992). This court reviews in a plenary fashion whether the Court of Federal Claims properly granted summary judgment and whether the Court of Federal Claims properly dismissed for failure to state a claim upon which relief can be granted, as both are questions of law. *Dehne v. United States*, 970 F.2d 890, 892 (Fed.Cir.1992).

## IV

Dairyland's principal contention on appeal is that the Court of Federal Claims inappropriately granted summary judgment based on inferences improperly drawn in favor of the Government, the moving party, while disregarding Dairyland's evidence of the parties' intent. Specifically, Dairyland challenges the Court of Federal Claims' holding that Dairyland could not prove a mutual mistake of fact as a matter of law because the 1973 sale contract allocated the risk that spent nuclear fuel reprocessing might become unavailable in the future. Dairyland argues that the Court of Federal Claims reached this incorrect conclusion by drawing inferences from the evidence improperly in favor of the Government to find that the parties not only considered the possibility of the commercial reprocessing industry's demise, but also intended that Dairyland assume the risk of this demise. Dairyland further contends that the Court of Federal Claims disregarded testimony by Dairyland's witnesses to the contrary, namely that

"[b]oth parties conducted negotiations on the explicit assumption that commercial reprocessing would continue to be available to [Dairyland] after its purchase of [the La-Crosse plant]."

■ A summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." RCFC 56(c). The moving party bears the burden of demonstrating the absence of genuine issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Furthermore, all evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable factual inferences should be drawn in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970). The moving party, however, need not produce evidence showing the absence of a genuine issue of material fact but rather may discharge its burden by showing the court that there is an absence of evidence to support the nonmoving party's case. *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2553. A nonmoving party's failure of proof concerning the existence of an element essential to its case on which the nonmoving party will bear the burden of proof at trial necessarily renders all other facts immaterial and entitles the moving party to summary judgment as a matter of law. *Id.* at 323, 106 S.Ct. at 2552.

■ In this case, Dairyland seeks the equitable relief of contract rescission based on the doctrine of mutual mistake of fact. *See Roseburg Lumber Co. v. Madigan,* 978 F.2d 660, 665 (Fed.Cir.1992) ("Where there has been a mutual mistake of material fact, resulting in a contract which does not faithfully embody the parties' actual intent, reformation, [and] rescission, . . . may be available to the adversely affected party."). At trial, Dairyland would bear the burden of proving that the parties to the 1973 sale contract were mutually mistaken as to the continued availability of commercial reprocessing of spent nuclear fuel throughout Dairyland's operation and decommissioning of the La-Crosse plant. To establish a mutual mistake of fact, Dairyland must show that:

(1) the parties to the contract were mistaken in their belief regarding a fact;

(2) that mistaken belief constituted a basic assumption underlying the contract;

(3) the mistake had a material effect on the bargain; and

(4) the contract did not put the risk of the mistake on the party seeking reformation.

*Atlas,* 895 F.2d at 750 (citations omitted). For the following reasons, we hold that Dairyland's inability to establish an essential element of its claim of mutual mistake, on which it would bear the burden of proof at trial, necessarily renders all other facts immaterial and entitles the Government to summary judgment as a matter of law on Dairyland's request for rescission of the 1973 sale contract.

## V

■ Notwithstanding the possible merit of Dairyland's arguments, we need not decide whether the Court of Federal Claims drew inferences improperly in favor of the Government or disregarded Dairyland's evidence of the parties' intent in reaching its holding that Dairyland failed to satisfy the fourth element of the doctrine of mutual mistake of fact. In this case, any such error by the Court of Federal Claims is harmless because the Government is nevertheless entitled to summary judgment based on Dairyland's inability as a matter of law to satisfy the first element of the doctrine of mutual mistake of fact. Dairyland contends that the continued availability of commercial reprocessing was a basic premise to the 1973 sale contract and the parties never considered the possibility, nor allocated the risk, of the commercial reprocessing industry's demise. To establish a mutual mistake of fact, however, the party seeking reformation must show that the parties to the contract held an erroneous belief as to an *existing* fact. *Id.* The availability

of commercial reprocessing in the future cannot constitute an existing fact at the time of the 1973 sale contract. "A party's prediction or judgment as to events to occur in the future, even if erroneous, is not a 'mistake' as that word is defined [under the doctrine of mutual mistake of fact]." Restatement (Second) of Contracts § 151 cmt. a (1981); *see, e.g., United States v. Southwestern Elec. Coop., Inc.,* 869 F.2d 310, 315 (7th Cir.1989) ("[R]ules governing rescission for either mutual mistake or singular mistake are inapplicable where, as here, a party's erroneous prediction or judgment as to future events is involved."); *Baker v. Penn Mut. Life Ins. Co.,* 788 F.2d 650, 661–62 (10th Cir.1986) (holding that no claim of mutual mistake can be stated on the basis of disappointed expectations as to a future event, which amount to "mere conjecture, not an existing fact"); *Shear v. National Rifle Ass'n of Am.,* 606 F.2d 1251, 1260 (D.C.Cir.1979) ("The mistake doctrine does not apply to predictions or promises of future conduct."); *United States v. Garland,* 122 F.2d 118, 122 (4th Cir.) ("A mutual mistake in prophecy or opinion may not be taken as a ground for rescission where such mistake becomes evident through the passage of time."), *cert. denied,* 314 U.S. 685, 62 S.Ct. 189, 86 L.Ed. 548 (1941); *see also* 13 Samuel Williston, Contracts § 1541 n. 5 (Jaeger 3d ed. 1970) (approving of case in which contract rescission was denied where assertion of a mutual mistake was based on a future contingency, not an existing fact); 3 Arthur L. Corbin, Contracts § 598 n. 15 (1960) (same). Indeed, there is uniformity among the circuit courts of appeals and the commentators that mutual mistake of fact cannot lie against a future event.

In *American Employers Insurance Co. v. United States,* 812 F.2d 700 (Fed.Cir.1987), this court faced a factual context strikingly similar to that here. In the *American Employers* case, this court affirmed the Claims Court's denial of reformation under the doctrine of mutual mistake of fact of a fully performed settlement agreement between an experienced insurer and the Government to provide relief for shipbuilding workers injured from asbestos exposure. *Id.* at 705. The insurer contended that when the settlement agreement was executed, neither party contemplated or predicted the possibility that former employees might seek workers' compensation for asbestos-related injuries years in the future. This court held that there was no mutual mistake of fact as to the future event that "former employees would bring claims for latent occupational injuries years after final settlement." *Id.* The court further noted that if anything, the insurer made an unilateral mistake, for which the remedy of contract reformation is unavailable.

Irrespective of whether or not AEC and Dairyland contemplated the future availability of commercial reprocessing at the time of the 1973 sale contract, we hold that Dairyland cannot establish mutual mistake of fact as a matter of law because the parties were not mistaken as to an existing fact. The grant of summary judgment for the Government on Dairyland's request for contract rescission therefore is required and fully supported by the record before us.

## VI

The Court of Federal Claims alternatively held that the unrestricted release contained in the 1973 sale contract barred Dairyland's claim for contract damages. On appeal, Dairyland contends that a release contained within a contract founded upon a mutual mistake of fact is ineffectual. Based on our holding that there was no mutual mistake of fact with regard to the 1973 sale contract, however, the release is valid. Furthermore, Dairyland presented no arguments either before the Court of Federal Claims or before this court that the parties were mutually mistaken about the extent of coverage of the release contained in the 1973 sale contract. Therefore, the release contained in the 1973 sale contract precludes Dairyland's claim for contract damages, and the Court of Federal Claims properly granted summary judgment on this issue.

## VII

For these reasons, the Government satisfied its burden as the moving party on a motion for summary judgment by showing that there is an absence of evidence to support Dairyland's case and that the Govern-

ment is entitled to summary judgment as a matter of law.

No costs.

*AFFIRMED.*