**KENNEDY HEIGHTS APARTMENTS LTD. I, and Wilshire–Washington Heights Limited Partnership, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 00–23C.

United States Court of Federal Claims.

Jan. 31, 2005.

John R. Riddle, Strasburger & Price, LLP, Dallas, Texas, for Plaintiffs.

Carolyn J. Craig, U.S. Department of Justice, Commercial Litigation Branch, Civil Division, Washington, D.C., for Defendant. Frank Z. Elmer, Office of Counsel, Department of Housing and Urban Development, Fort Worth, Texas, and Geoffrey L. Patton, Departmental Enforcement Center, Department of Housing and Urban Development, Washington, D.C., for Defendant.

## OPINION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS OR FOR SUMMARY JUDGMENT

WILLIAMS, Judge.

In this action, Plaintiffs seek to recover surplus proceeds from the Department of Housing and Urban Development's (HUD) foreclosure sale of their low-income housing projects pursuant to the Multifamily Mortgage Foreclosure Act (MMFA), 12 U.S.C. §§ 3701 *et seq.* In addition, they seek to recover rent subsidies on those projects, which they allege HUD suspended in breach of their housing assistance payment contracts.

This matter comes before the Court on Defendant's Motion To Dismiss, Or In The Alternative, For Summary Judgment. Defendant seeks to dismiss Plaintiffs' surplus claims for lack of subject matter jurisdiction, contending that these claims are based solely on violations of internal HUD documents—its Handbook, audit reports, and memoranda—which do not have the force and effect of law. Because Defendant has misconstrued Plaintiffs' claims which arise under the MMFA, the motion to dismiss is denied. Genuine issues of material fact preclude entry of summary judgment on Plaintiffs' claims for unpaid rent subsidies and the foreclosure sale surplus and on Defendant's counterclaim that Plaintiffs wrongfully retained project funds.

### Factual Background [1]

Plaintiffs, formerly owned two federally subsidized low-income housing projects, Kennedy Heights and Washington Heights apartments (the Projects) in Kaufman County, Texas.[2] In 1996, HUD was assigned the

---

1. The background is derived from Plaintiffs' Third Amended Complaint (Complaint) and the appendices supporting the pending motions.

2. The General Partners of Kennedy Heights and Washington Heights were Westport Housing Corporation (Westport) and United Housing Preservation Corporation (United) respectively.

A. Bruce Rozet was the Chief Executive Officer of Westport, and Deane Earl Ross served as the President of both Westport and United. *See* Mortgagee-in Possession Agreements attached to Third Am. Compl. Ross and Rozet were also both indirect owners of Management Assistance Group, Incorporated (MAGI), a California cor-

notes and mortgages on the Projects and became the mortgagee. Plaintiffs subsequently defaulted on their mortgage loans, and HUD took control of the properties until they could be sold at foreclosure. Pursuant to mortgagee-in-possession (MIP) agreements executed with Plaintiffs, HUD managed the Projects between August 1 and September 30, 1998, (the MIP period), until the foreclosure sale. The purpose of the MIP agreements was to allow for the transfer of possession and management of the properties to HUD as MIP, by requiring Plaintiffs to transfer physical possession of the Projects and ancillary personal property, including operating and other accounts, by August 1, 1998, assign HUD the right to receive rents and profits from the Projects, and cooperate and assist in the transition process. MIP Agreements, Def.'s App. 129–34.

On August 3, 1998, HUD appointed Duncan McMillian, a federal housing foreclosure commissioner, to preside over the foreclosure of the Projects pursuant to 12 U.S.C. § 3704. On August 28, 1998, Commissioner McMillian sold Kennedy Heights for $1,120,000 and Washington Heights for $1,420,000 to private buyers.

### The Alleged Surplus

Plaintiffs allege that the sales generated a surplus of $130,082 for Kennedy Heights and $146,282 for Washington Heights, to which they are entitled under Section 3712 of the MMFA. This statute provides that the mortgagor on a foreclosed property is entitled to receive surplus sale proceeds which remain after allowed expenses, liens, and obligations, including all "expenditures for the necessary protection, preservation, and repair of the security property," have been satisfied from the property's sale price. 12 U.S.C. § 3712 (2000).

Commissioner McMillian advised Plaintiffs that there was no surplus because the mortgages on the Projects, coupled with the expenses incurred by HUD in managing the Projects during the MIP period, had exceeded their sale prices. As such, Commissioner McMillian intended to release all sale proceeds directly to HUD. Plaintiffs obtained a Temporary Restraining Order in state court in Dallas County, Texas, directing Commissioner McMillian to pay the alleged surplus into the court's registry. On October 1, 1998, Commissioner McMillian removed the case to the United States District Court for the Northern District of Texas, and moved for summary judgment on the disputed surplus amounts. The district court transferred the case to the United States Court of Federal Claims, concluding that Plaintiffs' claims were properly brought under the Tucker Act. *Kennedy Heights Apartments, Ltd. v. McMillan,* 78 F.Supp.2d 562, 571 (N.D.Tex. 1999).

Once before this Court, Defendant moved to dismiss the action for lack of subject matter jurisdiction. The Court denied Defendant's motion because Plaintiffs' claims came within the Tucker Act because the Multifamily Mortgage Foreclosure Act is "money-mandating, and require[s] any surplus money from the foreclosure sale of plaintiffs' properties to be dispensed to plaintiffs." *Kennedy Heights Apartments, Ltd. I v. United States,* 48 Fed.Cl. 574, 580 (2001).

### Rent Subsidies

Pursuant to Section 8 of the United States Housing Act of 1937, 42 U.S.C. § 1437f, the parties executed four Housing Assistance Payment (HAP) contracts, so Plaintiffs could collect housing assistance payments to subsidize rents at the Projects.[3] Kennedy Heights was covered by three HAP contracts—TX16–L000–080 (Contract 80),

---

poration, which was an affiliate of Associated Financial Corporation, Inc. (AFC), a Delaware corporation. MAGI, through AFC and other affiliated entities, controlled the general partnership interests in various limited partnerships, which in turn owned and operated more than 160 HUD projects located throughout the United States. *See United States v. MAGI,* No. CR 00–0084–SC, Plea Agreement (S.D.Cal. Mar. 30, 2001), Def.'s App. at 2136–47.

**3.** The amount of the monthly assistance payment is the difference between the maximum monthly rent, as established by the contract and determined pursuant to 42 U.S.C. § 1437f(c)(1)-(2), and the rent the tenant is statutorily required to pay pursuant to section 1437a(a). 42 U.S.C. § 1437f(c)(2)(C)(3).

TX16–M000–130 (Contract 130), and TX16–M000–151 (Contract 151). Washington Heights was covered by one HAP contract—TX16–M000–197 (Contract 197). Plaintiffs allege that HUD withheld rent subsidies in the amount of $41,742 for Kennedy Heights and $58,519 for Washington Heights.[4] HUD pays Section 8 funds only for those days in a month when an apartment unit is occupied by a qualified tenant and is found to be in decent, safe and sanitary condition. Plaintiffs submitted request forms for rent subsidies on the Projects in August and September 1998, and received full payment under three out of their four HAP contracts for August 1998, but nothing on their requests for September 1998. Section 9 of three of the four contracts at issue provides:

> The Owner must prepare and submit requests for housing assistance payments in accordance with the administrative procedures established by HUD. All requests for assistance payments must be submitted on the forms prescribed by HUD and be properly executed by the Owner or the Owner's authorized agent.[5]

Plaintiffs' vouchers for rent subsidies for August and September 1998, were signed by Plaintiffs' management agent, Insignia. The September vouchers, like the August vouchers, were subject to the following certification:

> I certify that: 1) tenant's elig. and asst. was computed in accordance with HUD's regs., procedures, and the Contract and payable under the Contract, 2) required inspections, complete [sic], 3) such subsidy Units are decent, safe, sanitary, occupied and/or available for occupancy, 4) no amount in this bill has been previously billed or paid, 5) all data in this request is true and correct, 6) I have not and will not receive any money or other consideration from tenant or other source for Units beyond that authorized by HUD, its authorized agent or Comptroller of the U.S. I will make available all records for audit related to tenants elig. and asst. payments.

A1640–77; 1710–56.

Plaintiffs conditioned these voucher submissions, Form HUD–52670, with the following statement which was stamped at the bottom of each:

> Certification concerning the physical condition of the property is conditional upon and modified by the most recent Management Review and Physical Inspection Reports, and/or HUD's knowledge that the property currently has unaddressed physical needs.

A1640–77;1710–56.

The HAP contracts authorized HUD to suspend subsidy payments if HUD determined that Plaintiffs had defaulted under the contract and notified them as to the nature of their default and the steps required to cure. If Plaintiffs failed to cure within a timely manner, HUD could suspend subsidy payments until the default was remedied. Plaintiffs allege that HUD never provided them with notice of default or an opportunity to cure prior to suspending payments on the Projects for August and September 1998. The record here is unclear as to why HUD stopped the payments. Tr. (Feb. 6, 2004) at 5.

### Plaintiffs' Alleged Prior Material Breach of the HAP Contracts

Defendant alleges that Plaintiffs were part of a fraudulent insurance scheme involving Polar International Corp., an insurance broker, and Polar's employee, Benjamin Richman. Defendant relies upon a March 30, 2001 Plea Agreement in which MAGI pled guilty to engaging in an illegal insurance kickback scheme that involved various HUD projects. *See United States v. MAGI*, No. CR 00–0084–SC, Plea Agreement (S.D.Cal. Mar. 30, 2001), Def.'s App. at 2136–47, *see also Christopher Village, L.P. v. United States*, 360 F.3d 1319, 1325 (Fed.Cir.2004)

---

**4.** Defendants point out that there is a disparity between the amounts Plaintiffs requested on their Section 8 vouchers and the amounts claimed in this action. Def. Mot. to Dismiss or for Summ. J. at 17–18.

**5.** The HAP contract for Washington Heights Apartments (197) and two of the three Kennedy Heights Apartment HAP contracts (151 and 130) contain this language. The third HAP contract for Kennedy Heights Apartments (80) contains similar language in Section 5(e). *See* Compl. Exhibits 4, 1, 3, and 2, respectively.

(summarizing same Plea Agreement).[6] Defendant alleges that the MAGI kickback scheme involved Kennedy Heights and Washington Heights. Although neither Westport nor United were parties to the plea agreement, both were parties to a March 30, 2001 Consent Judgment against AFC, MAGI, A. Bruce Rozet, and Deane Earl Ross, among others, settling the companion civil action. Under the terms of the Consent Judgment, the Defendants agreed to pay the United States the settlement amount of $8,125,000 and agreed not to solicit, demand, or obtain any kickbacks, fee splits or payments of similar nature from anyone providing a good or service on behalf or HUD-assisted and financed projects owned, operated, or controlled by the Defendants or any of their affiliates. In return, the United States consented to release Defendants from liability for the conduct covered in the Consent Judgment.[7]

## Discussion

### Subject Matter Jurisdiction

In ruling on a motion to dismiss for lack of subject matter jurisdiction, the Court must construe all undisputed factual allegations in favor of Plaintiffs. *Cedars–Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583 (Fed.Cir.1993). Plaintiffs bear the burden of establishing jurisdiction by a preponderance of the evidence. *Taylor v. United States*, 303 F.3d 1357, 1359 (Fed.Cir.2002). Plaintiffs premise jurisdiction upon the Tucker Act, 28 U.S.C. § 1491(a)(1). This Act both confers jurisdiction upon the United States Court of Federal Claims and waives sovereign immunity with respect to certain actions for monetary relief brought against the United States. *See United States v. Mitchell*, 463 U.S. 206, 212–18, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983); *Fisher v. United States*, 364 F.3d

1372, 1376 (Fed.Cir.2004). Under the Tucker Act, sovereign immunity is waived for "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1).

Defendant argues that the Court lacks jurisdiction over Plaintiffs' surplus claims because they are based on alleged violations of HUD's handbook, memoranda, and audit report, none of which, Defendant claims, are "laws" which bind HUD or establish jurisdiction under the Tucker Act. Def.'s Mot. at 13–14. Defendant, however, misconstrues the Complaint because Plaintiffs base their surplus claims on the MMFA, 12 U.S.C. § 3712, not on the internal HUD materials identified by Defendant. As the Court previously held in *Kennedy Heights Apartments Ltd., I v. United States*, 48 Fed.Cl. 574, 580 (2001), the MMFA, 12 U.S.C. § 3712, is a money-mandating provision creating a right to bring suit in this Court under the Tucker Act. Plaintiffs rely on HUD's handbook, memoranda, and audit report as evidence to support their surplus claims under the MMFA, not as the basis for their cause of action. Accordingly, Defendant's motion to dismiss is denied.

### Summary Judgment [8]

The Court may grant a motion for summary judgment if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." RCFC 56(c). A genuine issue is one that "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if it "might affect the outcome of the suit." *Id.* at 248, 106 S.Ct. 2505. The movant has the

---

**6.** While the Plea Agreement did not mention Kennedy Heights or Washington Heights expressly, there appears to be an association between MAGI, Westport, United, and AFC, which will need to be more fully developed at trial.

**7.** These parties also signed a March 30, 2001 Administrative Agreement, under which they agreed, among other matters, to divest their general partnership interests in partnerships which owned HUD Projects. Def.'s App. at 2117.

**8.** Defendant also moves to dismiss Plaintiffs' claims for surplus and unpaid rent subsidies for failure to state a claim upon which this Court may grant relief. Pursuant to RCFC 12(b)(6), this motion is treated as a motion for summary judgment, since the Court has examined materials outside the Complaint. *Dairyland Power Coop. v. United States*, 16 F.3d 1197, 1201 (Fed. Cir.1994).

burden of establishing the absence of genuine issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once this burden is met, the onus shifts to the non-movant to point to sufficient evidence to show a dispute over a material fact that would allow a reasonable finder of fact to rule in its favor. *Liberty Lobby,* 477 U.S. at 256, 106 S.Ct. 2505. It is not necessary that such evidence be admissible, but mere denials, conclusory statements, or evidence that is merely colorable or not significantly probative will not defeat summary judgment. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Liberty Lobby,* 477 U.S. at 249–50, 106 S.Ct. 2505; *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390–91 (Fed.Cir.1987). A court does not "weigh" each side's evidence when considering a motion for summary judgment. *Contessa Food Prods., Inc. v. Conagra, Inc.,* 282 F.3d 1370, 1376 (Fed.Cir.2002). Rather, " 'the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)).

### Plaintiffs' Surplus Claims

██ Plaintiffs allege that HUD is liable for a surplus of $130,082 with respect to the sale of Kennedy Heights and $146,282 with respect to the sale of Washington Heights. Plaintiffs claim that the $102,527.98 and $98,205.43 that HUD spent during the MIP

period to hire armed security guards to patrol Kennedy Heights and Washington Heights were not "necessary expenses" which could properly be subtracted under the MMFA, 12 U.S.C. § 3712(6).[9]

Defendant counters that hiring eight armed security guards full-time from August 1 through September 30, 1998, was a necessary expense due to the high volume of narcotics trafficking which allegedly was occurring at the Projects at the time HUD took control of those properties. To support its contention, Defendant proffers the deposition testimony of Ms. Feebie Barnes, HUD's property supervisor for the Projects:[10]

Q. And when you say you had a lot of drug problems, how do you know you had a lot of drug problems?

A. It was very obvious. You had your—your guys hanging out, and being in the business as long as we have and you could tell, you know, when a guy is up to no good. We had a lot of undesirables hanging around the property, you know—

. . . .

A. And we found crack bags all over the property [at Kennedy Heights]. And that's a good sign of using as well as selling.

Barnes Dep. at 32–34, Def.'s App. at 3548–50.[11]

Defendant's evidence squarely contradicts the deposition testimony given by Plaintiffs' witness, Ms. DiAne Asiedu, the senior property manager for the Projects.[12] This prop-

---

**9.** Plaintiffs also claim that HUD purchased unnecessary supplies and equipment to be used at the Projects.

**10.** Ms. Barnes was the property supervisor of the properties from August 1, 1998 until October 1998. Barnes Dep. at 9, Def.'s App. at 3535.

**11.** Defendant also cites an October 3, 2002 Independent Security Expert Report prepared by Richard J. Fries for this litigation, in which he opined that eight guards were reasonable and necessary. Mr. Fries is a consultant of the Wackenhut Corporation, which provides security services to the private sector and the Government. Fries Rep. at 10, Def.'s App. at 3298. Plaintiffs have asked the Court not to consider Mr. Fries' opinion, because he has not been qualified as an expert, and his report, which they

argue is hearsay, was not produced to Plaintiffs until after the close of discovery. Pls.' Opp. at 20, n. 4. Defendant argues that it was not possible to deliver Mr. Fries' report to Plaintiffs until several weeks after the close of discovery because of a delay in procuring his services, but that his identity and whereabouts were previously disclosed to Plaintiffs. In addition, Defendant offered to agree to enlarge the discovery period so that Plaintiffs could depose Mr. Fries, but Plaintiffs opposed any enlargement. The Court does not accept the report for purposes of this motion. Def.'s Reply at 24 n. 21.

**12.** Ms. Asiedu was the senior property manager of Kennedy Heights beginning in February 1994 until August 1998, and of Washington Heights from August 1993 until August 1998. Asiedu Dep. at 6, Pls.' App. at 7.

erty manager testified that the conditions surrounding the Projects on August 1, 1998, warranted placing just one, not four, armed security guards at each property:

> Q. What was the level of security needed, reasonable and necessary, at Kennedy Heights when you left the property in August of 1998?
>
> A. One officer, eight hours per night.

Asiedu Dep. at 17, Pls.' App. at 18.

In ruling on a motion for summary judgment, the Court does not "weigh" evidence. The parties' conflicting evidence thus raises genuine issues of material fact as to whether it was necessary for HUD to place four armed guards at each Project. On this record, the Court is unable to enter summary judgment on the surplus claim.

### Plaintiffs' Claims for Rent Subsidies

■ Plaintiffs contend that HUD's nonpayment of rent subsidies for August and September of 1998 breached the HAP contracts because HUD allegedly did not provide the requisite notice and opportunity to cure. Defendant argues that Plaintiffs were not entitled to HAP payments because they had improperly altered the certifications in the request forms.

The HAP contracts required Plaintiffs to submit a payment request form each month in order to be paid the subsidy due for that month. Requests were to be made on HUD Form 52670, which contains a certification to be signed by the property owner that the apartment units for which subsidies are sought are in a decent, safe, and sanitary condition.

Plaintiffs' property manager completed the Form 52670 submissions, signing the certifications for August and September 1998 to request subsidy payments for those months, but beneath each certification stamped additional language, which read:

> Certification concerning the physical condition of the property is conditional upon and modified by the most recent Management Review and Physical Inspection Reports and/or HUD's knowledge that the property currently has unaddressed physical needs. *Id.*

Defendant contends that this language conditioned the certifications and rendered the Form 52670s invalid, removing HUD's obligation to pay the subsidies. However, the certifications that Plaintiffs previously had submitted contained this same language as early as February 1998, and HUD continued to make payment on requests containing these altered certifications up until September 1998. Plaintiffs assert that the certifications are not material and do not vitiate Defendant's obligation to make the payments. The record is unclear as to how or why these payments were stopped, why Plaintiffs included the conditions on their certifications and why Defendants had paid vouchers containing these conditional certifications previously.

As such, there are genuine issues of material fact regarding Plaintiffs' entitlement to these subsidies.

### Plaintiffs' Alleged Prior Material Breach

■ A party to a contract may defend against an alleged breach of contract by asserting that the other party first breached the contract, thereby excusing nonperformance. *Christopher Village,* 360 F.3d at 1334 (citing E. Allen Farnsworth, *Farnsworth on Contracts* § 8.15, 439 (1990)). This doctrine of prior material breach is based upon the principle that "where performances are to be exchanged under an exchange of promises, each party is entitled to the assurance that he will not be called upon to perform his remaining duties ... if there has already been an uncured material failure of performance by the other party." *Id.* (citing Restatement (Second) of Contracts § 237b, cmt. b (1981)).

■ Defendant argues that even if HUD breached the HAP contracts, its breach was excused by Plaintiffs' prior material breach of those contracts by their submission of improper vouchers and fraudulent insurance data in support of rent increase requests. According to Defendant, these latter submissions were made as part of the MAGI insurance fraud and breached contract provisions

which stated that filing "any false statements or misrepresentations to HUD in connection with HUD mortgage insurance, loan processing, or administration of th[e] Contract" would constitute a default. Compl. Ex. 1 ¶ 26(a)(4).

There are genuine issues of material fact concerning whether Plaintiffs submitted improper vouchers or fraudulent insurance data in support of requested rent increases on these two properties under the contracts at issue here. Neither the Plea Agreement nor the Consent Judgment establishes these facts.[13] *See Christopher Village,* 360 F.3d at 1334 (finding that MAGI's Plea Agreement, without more, did not directly implicate Plaintiff partnership and its general partner in the fraud, where they were not parties to that agreement). Nor does the unsworn declaration of Benjamin S. Richman, an insurance agent who helped orchestrate the fraudulent MAGI insurance scheme, in which he identified Kennedy Heights and Washington Heights as among the properties involved in the scheme. Def.'s App. 3812–13. Not only is his declaration unsworn, *see* 28 U.S.C. § 1746(2), but it does not adequately explain Plaintiffs' involvement in the MAGI fraud, or the applicability of the fraud to the properties at issue. *See Litton Indus. Prods., Inc. v. Solid State Sys. Corp.,* 755 F.2d 158, 164 (Fed.Cir.1985) ("[M]ere allegations by declaration or otherwise do not raise issues of fact needed to defeat a motion for summary judgment.").

Even if the Court were to consider Mr. Richman's Declaration, the Government has not sufficiently established that Plaintiffs in this action submitted false insurance cost requests with respect to the Kennedy Heights and Washington Heights properties. Mr. Richman's Declaration states:

Enclosure 3 to this declaration is an example of the spreadsheets prepared by Mr. Penn allocating the cost of the kickback to the Covered properties, including Kennedy Heights and Washington Heights for the 1991–1995 policy years. The policy year ran from March 1 to March 1. The fees were hidden in the total premium billed to the projects by devising various fee categories such as a service fee, indirect property fee, indirect liability fee, and charging to them in amounts that would not raise suspicion. Generally the overall costs [sic] of insurance was allocated among the properties on a per unit basis, so that larger projects would pay more than smaller projects.

App. To Def.'s Mot. Summ. J. at 3813.

These fees that were hidden from HUD are equally hidden from the Court. Upon reviewing the spreadsheets referenced in Mr. Richman's declaration, the Court is unable to ascertain which costs are bogus and which are legitimate. Mr. Richman's declaration merely points the Court to a spreadsheet that allegedly contains imbedded fraudulent costs—without directing the Court to specific items of fraud, or at the very least, providing the Court with the *actual* costs of insurance premiums in comparison to the *billed* insurance premiums for Washington Heights and Kennedy Heights. Nor does Mr. Richman's Declaration provide the Court with a formula, or per property breakdown, sufficient for the Court to determine the actual surplus billed to the properties at issue. Likewise, Defendant points the Court to documents showing rent increase requests in an effort to persuade this Court that Plaintiffs committed fraud. However, none of these documents, as far as the Court can tell, indicate what percentage, if any, of the rent increases were based on fraud.

Defendant's reliance on *Christopher Village,* to establish a prior material breach in this case is misplaced. In *Christopher Village,* also involving the MAGI insurance fraud, the Federal Circuit held that fraudulent insurance data submitted on behalf of the plaintiffs (the owners of a HUD subsidized property) to support a rent increase request on the property constituted a prior material breach of the HAP contract, which excused HUD's assumed breach. 360 F.3d at 1334. *Christopher Village* does not assist the Government here because it was the plaintiffs' concession that fraudulent data had been submitted which the court found estab-

---

13. Even if Plaintiffs had been parties to the Consent Agreement, that Agreement did not purport to be an admission of liability. Consent Judgment ¶ 5, Def.'s App. at 2098.

lished a breach. *Id.* In the case at bar, Plaintiffs have not made such a concession and dispute that their conduct was fraudulent. On this record, the Court finds that Defendant has failed to demonstrate an absence of a genuine issue of material fact regarding prior material breach.

### Defendant's Counterclaim

██ Defendant filed a counterclaim to recover an unspecified amount of Project-related funds, which Plaintiffs allegedly retained in breach of MIP agreements that required Plaintiffs to deliver to HUD "all funds in the Property's operating accounts, reserve fund accounts, and any other accounts derived from or associated with the operation of the Property" by August 1, 1998. MIP Agreement ¶ 4; Def.'s App. at 130.

Plaintiffs argue that, as a practical matter, they will not be liable on the counterclaim to the extent a surplus exists which covers the amounts that Defendant claims were wrongfully retained. Because resolution of Defendant's counterclaim is intertwined with the factual issues surrounding the surplus from the foreclosure sales of the Projects, the Court cannot enter judgment on the counterclaim at this juncture.

### Conclusion

1. Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction is **DENIED**.

2. Defendant's Motion for Summary Judgment is **DENIED**.

3. The Court will convene a telephonic status conference to discuss further proceedings in this action on **February 9, 2005 at 10 a.m. EST**. The Court will initiate the teleconference.