# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- | ) |
| | ) |
| Quality Trust Inc. | ) ASBCA No. 59983 |
| | ) |
| Under Contract No. W912P6-15-C-0002 | ) |

APPEARANCE FOR THE APPELLANT:      Mr. Lawrence M. Ruiz
         President

APPEARANCES FOR THE GOVERNMENT:      Thomas H. Gourlay, Jr., Esq.
         Engineer Chief Trial Attorney
         Kimberly J. Sabo, Esq.
         Engineer District Counsel
         U.S. Army Engineer District, Chicago

## OPINION BY ADMINISTRATIVE JUDGE PROUTY
## ON THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT

The government has filed a motion for summary judgment arguing that there are no disputed material facts in this case, which is about the propriety of the government's terminating the contract for default because appellant, Quality Trust Inc. (Quality), did not secure performance and payment bonds and proper insurance for the contract as required. Quality, acting *pro se* through its president, opposes the motion, but does so without disputing the controlling material facts.* The government filed no reply brief in support of its motion. In any event, for the reasons stated herein, we conclude that there are no material facts in dispute, and enter judgment in favor of the government.

## STATEMENT OF FACTS FOR PURPOSES OF THE MOTION

On 19 December 2014, the United States Army Corps of Engineers awarded to Quality Contract No. W912P6-15-C-0002 (the contract) to perform a sewer rehabilitation project at Lake Station, Indiana at Quality's bid price of $368,464 (R4, tab 1 at 1). Ms. Regina Blair, the government's contracting officer (CO) informed Quality of the award through a letter that she sent via email to Mr. Lawrence Ruiz, Quality's president, informing him of the government's award and reminding Mr. Ruiz that the contract

---

\* Quality's opposition (app. opp'n) was also captioned as a "Motion to Strike," but the text of the filing gave no basis to strike the motion for summary judgment beyond merely opposing it. Accordingly, we treat Quality's filing as an opposition to the government's motion.

required his company to obtain performance and payment bonds at 100% of the contract value within 10 days of the award (R4, tab 1, tab 14 at 1-2, email forwarding letter). Ms. Blair's letter also reminded Mr. Ruiz of the contract's requirement that Quality obtain a "Certificate of Liability Insurance," which included an endorsement stating, *"[a]ny cancellation or material change in the coverage adversely affecting the Government's interest shall not be effective unless the insurer or the contractor gives 30 days written notice of cancellation or change as required to the US Army Corps of Engineers,"* required by the contract's specifications (R4, tab 1 at 1-2).

The contract did, in fact, require Quality to obtain performance and payment bonds within 10 calendar days after award (R4, tab 2 at 1, 24), and, before commencing work, to also secure and provide proof of liability insurance to the CO, including an endorsement by the insurer to the effect of the words required by Ms. Blair's letter to Quality, that, any cancellation or material change in the coverage required 30 days written notice to the CO (*id.* at 20, incorporating Federal Acquisition Regulation (FAR) 52.228-5, INSURANCE–WORK ON A GOVERNMENT INSTALLATION (JAN 1997), paragraph (b)). As will be seen below, Quality did neither although it is not clear that the failure to obtain the insurance had yet ripened into a breach of contract terms.

On 28 December 2014, the day before the performance and payment bonds were due, Mr. Ruiz sent an email to Gregory Hermsen, the government contracting specialist working on the contract, requesting more time to provide the bonds (R4, tab 14 at 1). Mr. Ruiz explained that, given the holidays, some of his "program people" were out until 5 January, and he requested 10 "working days" after their return on the fifth, and perhaps a longer time because of "year end reports" (*id.*).

The record is devoid of any indication that Mr. Hermsen or anybody else from the government responded to Mr. Ruiz's request before 8 January 2015, when the CO, Ms. Blair, sent Mr. Ruiz a two-page letter captioned as a "Cure Notice" which gave Quality 10 days to remedy its failure to obtain the contractually-required bonds (R4, tab 13). The cure notice stated that Mr. Ruiz acknowledged receipt of contract award on 28 December 2013 and thus performance and payment bonds and insurance were due on 7 January 2015 (*id.* at 3). The letter also "acknowledged" the 28 December request for extension, and stated that, as of 8 January 2015, Quality had not provided the required bonds and insurance (*id.*). The letter further stated that the government viewed Quality's failure to submit the contractually-required documents to be a condition "endangering performance of the Contract," and that, if it weren't remedied within 10 days, the government might terminate the contract for default pursuant to FAR 52.249-10, DEFAULT (FIXED-PRICED CONSTRUCTION) (APR 1984), which is included in the contract (*see* R4, tab 2 at 17). Finally, the letter directed Mr. Ruiz to provide all responses to the letter in writing or by email to Ms. Blair (R4, tab 13 at 4).

2

On 21 January 2015, Ms. Blair sent an email and a certified letter to Mr. Ruiz, both of which informed him of the government's intent to terminate the contract within five business days if Quality failed to provide the "bonds and insurance" to the government within that time (R4, tab 12 at 1, email, tab 11 at 1, certified letter). Evidently, there was some discussion between government representatives and Mr. Ruiz between the time that the 8 January 2015 cure notice was sent and the time that the 21 January 2015 communications from the government were written, because the letter and the email both referred to Mr. Ruiz's contending that he had not received the 8 January cure notice (*id.*). The email implicitly disputed Mr. Ruiz's allegation that he had not received the cure notice by "advis[ing]" Mr. Ruiz that the government's email included a "tracking system" that showed delivery of the cure notice at some time on 8 January 2015 (R4, tab 12 at 1). The Rule 4 file, in fact, includes a page that appears to demonstrate that the cure notice was delivered to Mr. Ruiz's email server on 8 January 2015 at 2:21 p.m., though it does not include confirmation from Mr. Ruiz's email server that it was received (R4, tab 13 at 1).

Later on 21 January 2015, Mr. Ruiz sent an email to Ms. Blair responding to the email sent by her that day (R4, tab 10). In the email, Mr. Ruiz asserted that he had not earlier received the 8 January 2015 cure notice because of some "information technology issues going on" (*id.* at 1). In the email, Mr. Ruiz also stated that, in the bidding, Quality was "able to use the same SBG Bonds under the SBA surety bond guarantee program for this project," and that he did not anticipate any problems other than the need for more time to get the bonds (*id.*). Less than 15 minutes after receiving this email on 21 January, Ms. Blair responded to Mr. Ruiz's email with another email, requesting a date when the bonds and insurance would arrive at her office (R4, tab 9 at 1).

The next known communication between Quality and the government occurred almost a week later in an email exchange on 27 January 2015 (*see* R4, tab 8 at 1-2). In the email that opened the exchange, Mr. Ruiz stated that he could not find certain correspondence from the government, but that he knew of the five-day deadline and was working to obtain the necessary bonds, which he would get to her "soon" (*id.* at 2). Ms. Blair responded that Mr. Ruiz had not provided "any valid reason for the delay; thus, your request is denied" (*id.* at 1). She further stated that, if the bonds and insurance were not in her office by the close of business the following day (28 January), the government would terminate the contract for default (*id.*).

Later that day, Mr. Ruiz began drafting a response to Ms. Blair's 27 January letter threatening default, although he completed and sent it on 28 January (*see* R4, tab 7 at 1-2 ("I am continuing this letter today")). Mr. Ruiz's 28 January email explained that the reason he was having difficulty getting his bonds in order had to do with his bonding company and the completion of a separate project for the state of Kansas (*id.* at 1). Mr. Ruiz further expressed his hope that he could get the bonds signed by midnight, and

inquired whether he could send an electronic copy of the signatures via a PDF file to Ms. Blair (*id.*). Shortly after sending Ms. Blair this note, he "cc'd" her on an email that was from Mr. Ruiz to an attorney named L. Jay Labe, who apparently represented a bonding company with whom Quality had a pre-existing dispute (R4, tab 6 at 1-2). The extensive details of the letter are not material here except that Mr. Ruiz expressed his "dire need" for bonds "today" and told Mr. Labe that he had "contacted some agencies in Washington," apparently to complain of the bonding company's stance (*id.* at 1).

Later on 28 January 2015, Mr. Ruiz forwarded to Ms. Blair a document that purported to be a proof of insurance (R4, tab 5). This document did not include the contractually-required language to the effect that the CO would be given 30 days written notice prior to cancellation of the policy (*id.*).

On 6 February 2015, Ms. Blair drafted an internal memorandum justifying terminating the contract for default (R4, tab 3). In the document, Ms. Blair discussed a telephone call that she had received from a new bonding company on 28 January 2015, stating that it was preparing to offer bonds to Quality, which caused her to hold off on issuing the termination for default (R4, tab 3 at 2). According to Ms. Blair's memorandum, when no bond had been received by the government by 5 February, she contacted the new bonding company and was told that no bonds would be issued for Quality (*id.* at 2-3). She then determined to terminate the contract (*id.* at 3). Ms. Blair's internal memorandum also faults the insurance for being inadequate in amount (*id.* at 2).

No bonds were ever provided by Quality to the government (compl. ¶ 3). Moreover, there is no indication that any further proof of insurance beyond the certificate sent on 28 January 2015 was every provided by Quality to the government. On 13 February 2015, Ms. Blair issued a contracting officer's decision in the form of a modification to the contract effecting a termination for default for failure to provide the proper bonds and insurance (R4, tab 3 at 2-3). By undated letter, received by the Board on 11 May 2015, Quality filed a timely notice of appeal to the Board.

## DISCUSSION

The government is entitled to summary judgment in its favor here because we are presented with no disputed material facts calling into question the propriety of the government's decision to terminate the contract for default. Notwithstanding multiple efforts and extended deadlines by the government, Quality utterly failed to provide the contractually-required performance and payment bonds. As will be discussed below, this failure constituted a material breach of the contract, which would justify its termination for default unless Quality could prove its default was excusable or the government's action was an abuse of discretion. Despite making a plethora of allegations of unsubstantiated malfeasance by parties other than itself in its pleadings, Quality has presented no evidence

4

excusing its failure to perform or otherwise calling into question the government's exercise of its discretion.

## I. The Standards for Summary Judgment and Requirements for its Opposition

The standards for summary judgment before the Board are well established and need little elaboration here. Summary judgment should be granted if it has been shown that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A non-movant seeking to defeat summary judgment by suggesting disputed facts "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quoting *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968)). Put another way, if the non-moving party carries the burden of proof at trial for elements of its case and fails to provide such proof at the motion for summary judgment, the moving party is entitled to summary judgment. *Dairyland Power Coop. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994).

## II. The Government has Produced Undisputed Facts Justifying its Termination of Quality's Contract for Default

To meet the preconditions for terminating a contract for default under the contract's default clause, the government must demonstrate that the contractor failed to prosecute its work with the diligence necessary to insure its completion within the time specified by the contract. FAR 52.249-10(a); *see also ADT Construction Group, Inc.*, ASBCA No. 55358, 13 BCA ¶ 35,307 at 173,311. Notwithstanding the fact that this appeal was brought by Quality, the burden of proof for showing that the termination was justified falls upon the government. *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987); *ADT*, 13 BCA ¶ 35,307 at 173,312. But if the government makes this demonstration, the burden of going forward or production shifts to Quality to show that its failure to perform was excusable or that the government abused its discretion. *ADT*, 13 BCA ¶ 35,307 at 173,312; *Double B Enters., Inc.*, ASBCA Nos. 52010, 52192, 01-1 BCA ¶ 31,396 at 155,110; *see also Gen. Injectables & Vaccines, Inc. v. Gates*, 519 F.3d 1360, 1363 (Fed. Cir. 2008) (regarding late deliverables).

Here, the government met its initial burden demonstrating that the termination for default was justified. With respect to the performance and payment bonds, there is no dispute that terms of the contract required Quality to obtain the bonds within 10 days of being notified of contract award and that Quality was notified of that award, at the very latest, on 28 December 2015. There is also no dispute that the government never granted any extensions of time to Quality to obtain these bonds, except to the extent that its multiple cure notices included deadlines after which the government threatened to take action. It is further undisputed that, at the time that the government terminated the

contract, 13 February 2015, Quality had obtained no such bonds and the contractually-imposed deadline was long past. Because failure to obtain (or continue to hold) contractually-required bonds is considered to be a material breach of the contract, it justifies termination for default. *See Pacific Sunset Builders, Inc.*, ASBCA No. 39312, 93-3 BCA ¶ 25,923 at 128,945 ("[f]ailure to provide performance and payment bonds is sufficient to terminate the contract for default unless the contracting officer's judgment was...unreasonable") (citation and internal quote marks omitted); *see also Airport Industrial Park, Inc. v. United States*, 59 Fed. Cl. 332, 334 (2004) (citing multiple cases from the Boards of Contract Appeals).

Whether lack of liability insurance should justify default in these circumstances is less clear because Quality's failure to obtain it is not as plainly untimely here. Nevertheless, we need not resolve the insurance matter because the government need only prove one sufficient basis to justify its termination for default. *See Empire Energy Mgmt. Sys., Inc. v. Roche*, 362 F.3d 1343, 1357 (Fed. Cir. 2004) (citing multiple cases); *AEON Group, LLC*, ASBCA Nos. 56142, 56251, 14-1 BCA ¶ 35,692 at 174,752; *see also Emiabata v. United States*, 102 Fed. Cl. 787, 792 (2012) (permissible to justify CO's termination decision even if not all bases sustained). Thus, even if we had cause to question the liability insurance basis for the termination enunciated by the CO, Quality's failure to obtain bonding is adequate for us to sustain the CO's decision.

III.    Quality has Not Produced any Evidence that Challenges the Government's Decision to Terminate its Contract for Default

Having found that the government met its burden of proving an adequate basis for terminating the contract for default, we now turn to whether Quality has produced evidence showing that its failure to perform was excusable or that the government abused its discretion. *See ADT*, 13 BCA ¶ 35,307 at 173,312; *Double B Enters.*, 01-1 BCA ¶ 31,396 at 155,110; *Gen. Injectables*, 519 F.3d at 1363. It has not.

As discussed above, for a non-moving party to defend itself against a motion for summary judgment, it is not enough to merely articulate a defense, but the party "must set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 248. Specific to the circumstances presented here, when the government has established a *prima facie* case supporting default, and appellant has not "offered any evidence that the failure was not due to its own fault or negligence," entry of summary judgment in favor of the government is appropriate. *Lawrence Fabricating Co.*, ASBCA No. 53317, 03-1 BCA ¶ 32,199 at 159,160; *see also Airport Industrial Park*, 59 Fed. Cl. at 338 (citing *Dairyland Power*, 16 F.3d at 1202) ("Because [appellant] has the burden of proving the excuse for its default, in opposing summary judgment [appellant] must allege facts that go to the existence of an excuse for its default."). Board Rule 7(c)(2) requires that facts be "support[ed] by specific evidence." It further explicates that such evidence should come

6

from citations to the record or "any additional evidence upon which it relies (e.g. affidavits, declarations, excerpts from depositions, answers to interrogatories, admissions)." Since no "facts" in Quality's opposition have *any* such support from specific evidence, we find that Quality has not met its burden in challenging the government's termination.

Moreover, to the extent that we may divine Quality's arguments, the unproved facts alleged in Quality's opposition to the motion would not change the results even if we were to accept them. First, Quality appears to allege that, because the bonds were "requested...by way of the SBA Government Surety Bond Program," the government was required to perform an "internal administrative investigation," and that it cannot be terminated for default unless "the government could prove without a shadow of a doubt that [Quality] acted in bad faith." (*See* app. opp'n at 1-2) Notwithstanding the fact that the record contains no support for the allegation that the bonds requested were from a government program (to the contrary, all of the sureties named in the correspondence cited above were private entities), there is simply no legal basis for Quality's barefaced allegations that the government was somehow required to perform an "internal administrative investigation" with respect to its case, or that the supposed origin of the bonds shifted the evidentiary burden to one in which the government needed to prove bad faith on the part of Quality. Tellingly, Quality makes no allegation that the government in any way acted to prevent it from obtaining its bonds in a timely way, which would be the only way that we can perceive that the supposed origin of the bonds in a government program would have any bearing upon the propriety of the government's termination decision.

The other arguments contained in appellant's opposition are equally without legal merit and factual support. The allegation that this case is "unprecedented" (*see* app. opp'n at 2), is belied by the cases cited herein. The suggestion that the Antideficiency Act, 31 U.S.C. § 1341, is somehow implicated in this case (*see id.*), is not based upon anything but a letter, not in any way linked to this contract or Quality, that appellant attached to its opposition that is dated 19 November 2007 (*see* app. opp'n, ex. A) – more than seven years prior to the events in question. It cannot in any way constitute evidence that presents a challenge to the government's decision to terminate the contract for default. The suggestion that the government's retention of the bid bond had anything to do with Quality's inability to obtain performance bonds (*see* app. opp'n at 2), is supported by no evidence and is contrary to all of the evidence already before us, in which the subject never arose during the government's many attempts to get Quality to comply with the contract. We take the remainder of appellant's arguments (*see* app. opp'n at 2-3), to constitute a request to simply walk away from the contract, which has no bearing upon the motion presently before us.

7

## CONCLUSION

For the reasons stated herein, we grant summary judgment in favor of the government. ASBCA No. 59983 is denied.

Dated: 5 May 2016

J. REID PROUTY
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 59983, Appeal of Quality Trust Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

8